# Richmond

## GEORGE CLARKE v. COMMONWEALTH.

November 17, 1932.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and
Browning, JJ.

The opinion states the case.

*W. M. Minter* and *Thomas J. Wilson, Jr.,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

George Clarke was indicted in the Circuit Court of Botetourt county for the murder of Ned Cox. He was found guilty of murder in the second degree and sentenced to confinement in the penitentiary for seventeen and one-half years. To that judgment this writ of error was awarded.

The first assignment of error is: "The action of the trial court in refusing to quash the *venire facias,* because the clerk, in impaneling the jury, called the names of the prospective jurors from the sheriff's return instead of drawing the names by lot as provided by law."

When the case was called, both counsel for the Commonwealth and defendant announced that they were prepared for a trial. Thereupon, the clerk began the impaneling of the jury by calling the names of the prospective jurors from the list as shown by the return of the sheriff. When the names of nineteen jurors had been called and the prospective jurors found free from exception, counsel for the defendant interposed the objection that the statute, section 5996, required that the selection of the jury should be by lot, and requested that that be done. The court overruled the motion to select the entire

panel by lot, but offered to select the remaining venire-
men by lot, which offer was accepted under protest.

Section 5986, Code of 1930, provides for the appoint-
ment by the judge of the circuit court, of not less than
two nor more than five persons as jury commissioners,
"who shall be competent to serve as jurors * * * and
shall be citizens of intelligence, morality and integrity."

Section 5988 provides that the commissioners shall
prepare a list of such of the inhabitants of the county
as are well qualified to serve as jurors, the whole number
of persons selected not to be less than one hundred nor
more than three hundred.

Sections 5989 and 5990 (Code, 1930) direct the de-
livery to the clerk of the court of the jury list, together
with a separate paper or ballot for each juror with the
name written thereon and each properly folded to resem-
ble the other; and further direct that the list and bal-
lots be deposited in a secure box which shall be kept
locked by the clerk and opened only at the direction of
the judge.

The pertinent provisions of section 4895 are as fol-
lows: "The writ of *venire facias* in case of felony shall
command the officer to whom it is directed to summon
twenty persons of his county or corporation, to be taken
from a list furnished him by the clerk issuing the writ,.
who are qualified in all respects to serve as jurors, to
attend the court wherein the accused is to be tried on
the first day of the next term thereof, or at such other
time as the court or judge may direct. At one term of
the court only one jury shall be summoned, unless the
court or judge thereof otherwise direct; and the jury so
summoned may be used for the trial of all the cases.
which may be tried at that term, both felonies and mis-
demeanors.

"The list mentioned in this section shall contain the
names of twenty-four persons drawn for that purpose by
the clerk of the court or his deputy from the names and

box provided for by sections fifty-nine hundred and eighty-eight and fifty-nine hundred and ninety of this Code. Such drawing shall be in the presence of the judge of the court, or in his absence of one of the commissioners in chancery provided for by section fifty-nine hundred and ninety-two of this Code, and a reputable citizen not connected with the accused or the prosecutor or, in a case of homicide, with the deceased, who shall be called upon for that purpose by the clerk conducting the drawing. If the presence of the commissioner cannot be obtained, the drawing shall be in the presence of two reputable citizens not connected as aforesaid and called upon by the clerk. The clerk shall notify the commissioner of the time his attendance is desired, and it shall be his duty to attend at such time at the clerk's office. The drawing, except as herein otherwise provided, shall conform as near as may be to the mode prescribed for drawing juries in civil cases."

In *Patrick* v. *Commonwealth,* 115 Va. 933, 78 S. E. 628, this court held that the statutes in reference to the selection of jurors in a felony case were enacted not only for the purpose of securing fit jurors but to avoid even the suspicion of partiality or corruption in their selection.

Counsel for defendant rely upon this language in section 4895: "The drawing, except as herein otherwise provided, shall conform as near as may be to the mode prescribed for drawing juries in civil cases," and contend that section 4895, in regard to the trial of a criminal case, has no provision with reference to impaneling of juries; that the jury in a felony case is to be impaneled as are juries in civil cases, under the provisions of section 5996, which reads:

"On the day when the jurors are summoned to attend at any court, the clerk shall write the names of each one who shall be in attendance and not excused, on a separate paper or ballot, and place the same in a box to be

kept for that purpose; and the juries for the trial of cases shall be selected therefrom by lot."

There is no merit in the contention. Section 5996 has no reference to the selection of a jury in a felony case. The language in section 4895—"The drawing, except as herein otherwise provided, shall conform as near as may be to the mode prescribed for drawing juries in civil cases"—has reference only to the manner in which the names of the prospective jurors shall be obtained from the jury box in the custody of the clerk. It bears no relation to the manner in which a jury shall be selected for the trial of a felony case. The confusion arises, we think, in failing to draw the distinction between the method of *drawing* the list, which constitutes the *venire facias,* and the method of *selecting* the jury for the trial of a felony case.

A mere reference to section 4900 of the Code of 1930 dispels any doubt which may arise. That section provides: "In every case of a felony, there shall be *selected* from the persons summoned, as aforesaid, a panel of twenty persons free from exception, from which panel the Commonwealth may strike four and the accused four, and the remaining twelve shall constitute the jury for the trial of the accused * * *." (Italics added.)

In Webster's New International Dictionary, the word "selected" is thus defined: "To take by preference from among others; to pick out; to cull * * *." From the same source we obtain this definition of the word "lot." "The use of lots as a means of deciding anything; as, to choose by lot."

In vesting in the trial court the discretionary power to select a panel of twenty persons from the persons summoned by the sheriff, the legislature did not intend to restrict the power of the court, as counsel contends. The method adopted by the trial court is the usual method, and, so far as we are advised, has been pursued without question heretofore.

As we construe the language of section 4900, it did not make selection by lot mandatory and we perceive no valid reason why in the exercise of a sound discretion the trial court should not secure from the persons summoned a panel of twenty, free from exception, either by selection or by lot or by the employment of the combined methods.

The second assignment of error challenges the action of the trial court in refusing to strike the evidence of the Commonwealth when the Commonwealth closed its case, and in further refusing to set aside the verdict of the jury for the reason that it was contrary to the evidence and without evidence to support it.

If it was error in this case to refuse to strike the evidence of the Commonwealth at the conclusion of the Commonwealth's case, it was likewise error to refuse to set aside the verdict based thereupon.

So far as the record discloses there was no eyewitness to the alleged murder of Cox and the case of the Commonwealth was necessarily built upon circumstantial evidence. It has for a long period of time been the settled law in this State that circumstantial evidence is legal and competent in criminal cases, and if it is of such a character as to exclude every reasonable hypothesis other than that the accused is guilty, it is entitled to the same weight as direct testimony. *Brown's Case,* 97 Va. 791, 793, 34 S. E. 882; *Longley's Case,* 99 Va. 807, 811, 37 S. E. 339.

The reason for this salutary rule is nowhere better stated than by Judge Christian in *Dean's Case,* 32 Gratt. (73 Va.) 912, 914: "There are some crimes committed with such secrecy that to require the production of a witness who saw the act committed would be to defeat public justice, to deny all protection to society, to let the greatest offenders go free, and the most heinous crimes go unpunished."

Clothed as he is with the presumption of in-

nocence, an accused, especially in a case where his conviction is sought upon circumstantial evidence, is entitled to have the evidence scanned with great care; but, when the circumstances proved are of such a character as to warrant a verdict of guilty, neither courts nor juries should be alert to discover technical loop-holes through which the guilty can escape merited punishment. When, after a fair trial, a jury has found a verdict of guilty, the motion of an accused to set aside the verdict on the ground that it is contrary to the evidence "should be granted only in a case of plain deviation from right and justice." *Dean's Case, supra.*

The record discloses that Ned Cox, in an intoxicated condition, on the 15th of March, went to the home of Mrs. Rene Clarke, mother of the accused. At the time of his arrival, in addition to Mrs. Clarke, Miss Helen McDaniel and a negro named Irvin Pierce were present at the home. Mrs. Clarke and Miss McDaniel, who are under indictment as accessories to the murder of Cox, did not testify in the case. Pierce, who is also under indictment as an accessory, did testify as a witness. His version of what transpired at the Clarke home and of the subsequent events may be thus summarized:

When Cox arrived at the home he requested Mrs. Clarke to sell him liquor. She informed him that she had quit selling liquor and did not have any. Cox then asked that she give him some pie and coffee. She gave him coffee and he spilled a portion of it on the floor. During his stay Cox embraced Miss McDaniel. He then left the house but returned in "about" forty minutes, but was denied admittance by Mrs. Clarke. Thereupon, he began knocking and kicking the door, and called Mrs. Clarke vile names. After Cox's second departure, the accused came to the home and was informed by his mother of Cox's outrageous conduct. Accused informed his mother that he had passed Cox in the road on his way home and that he would go and overtake Cox and beat him. In

company with Pierce, accused pursued Cox for a distance of approximately a mile. When overtaken, Cox was sitting on the roadside with his nose bleeding. As the car in which accused was riding was stopped opposite Cox, he (Cox) came over to the car, placed his hand upon the side of the car where Pierce was sitting and called Pierce a vile name. Pierce shoved or struck Cox in the breast. Accused then drove a short distance from Cox, turned the car around and when he arrived at the point where Cox was sitting upon the ground, he got out of the car and struck Cox several times in the face, and left him with the remark that he would return and take him (Cox) home. When accused arrived at the Clarke home he told Pierce that if he said anything about his hitting Cox that he (Pierce) would not tell anything more. Securing a gun from the home, accused announced he would "take Ned home." Mrs. Clarke asked permission to accompany him, and together they left the house in an automobile and were absent approximately thirty minutes. Pierce remained at the house until the return of the Clarkes but neither of them gave any account of their journey.

Accused, when charged with the murder of Cox, at first denied that he had seen Cox on the Sunday night the assault was made. Subsequently, when confronted by Pierce who stated that he had hit Cox one time in the breast and that accused "had done the rest," accused replied: "That is a damn lie. You hit him in the face three or four times." Clarke admitted that he and his mother left the home after the assault upon Cox.

At the time Clarke was arrested a blood spot was observed on the right door of the car, near the handle. Subsequently the interior of the car was examined, and it appeared to have been recently washed or cleaned. In answer to the question propounded to him, "Could you tell whether or not there had been any blood in the back of the car?" the witness, Williamson, replied, "It looked

to me mighty like it; there were some kind of spots in there that looked like blood—spotted like blood." At the point where the assault occurred a large pool of blood was found on the morning of the 16th.

When the report was circulated that Cox was missing, the accused did not volunteer the information that he had seen Cox the previous night. He did, however, say to Irvin Pierce, "Maybe Ned wanted a drink of water and walked over to the river and fell in the river." That was the first suggestion by anyone which threw any light upon Cox's disappearance.

While accused and Helen McDaniel were incarcerated in jail, the following notes were written by accused to Miss McDaniel:

"French," (or "Frenchy") : "I told the law that Irvin asked me to take him up there to whip Ned Cox for cursing him, and I told the law he hit him three licks in the face and told the law we left him sit there when we left him and I come on back home and stopped there about ten minutes, and we went on up the hollow and put the car in the shed and come back and went to bed. Irvin told the law that he stayed with you and me and mother went in that * * * Irvin mit to the law he hit Ned one lick in the breast that what they told the law that I come back and cought Ned in bed with you and mother and I killed him. That what they hold her for. They are trying to put the kill Ned on me. That what John N. told me yesterday. Tom Wilson will be here tomorrow and mother too."

"* * * they are hold you for a witness the law said I told them to go and see the Sweet boy and the Heltel boy and see what no about this. I told you they said if the nigle would own up to it they could do much with me, but if I can get out on bond I will see about this. I told them that so much but that does not amount to so much. What go is what you tell the Jong and the law."

When the body of Cox was taken from the river where

it had reposed two days, it was found that the nose had been broken, and there were abrasions on the face and limbs.

The Commonwealth does not claim that the marks of violence were sufficient to produce death, but does rely on the fact that Cox met death by drowning, which fact is not controverted. The theory of the Commonwealth is that the accused, enraged by the conduct of Cox toward his mother and his friend, Miss McDaniel, administered to Cox a severe beating; that, as an afterthought, he sought to conceal the results of the assault, and carried Cox in the automobile for a distance of approximately one-half mile, and threw him in the nearby river.

The defense is based upon the inference that Cox, in a drunken condition, might have been struck by a passing motorist, and in his effort to secure liquor which was known to be hidden along the river bank, or to quench his thirst, wandered to the river and was accidentally drowned. To sustain that contention several witnesses were introduced, who testified that they passed Cox in the road, and that he was in a drunken condition; but no witness stated that he had struck Cox with an automobile.

At the place in the road where the pool of blood was, a tan shoe belonging to Cox was found. There is practically no dispute that the distance from the place where the blood was found in the road to the river is approximately one-half of a mile. According to all the evidence, the land between the road and the river was rough, was grown up in a dense mass of underbrush, briars and grapevines, which were in such profuse growth that it was practically impossible for a person to have wandered from the road through the dense underbrush into the stream.

When the body of Cox was taken from the river, it

was examined by H. C. Campbell, who testified as follows:

"Q. What about Mr. Cox's feet?.

"A. His feet?

"Q. His shoes; yes, sir?

"A. He had only one shoe on.

"Q. Mr. Campbell, did you make an examination of the body after it was pulled from the river, did you make an examination of that sock?

"A. Yes, sir.

"Q. How about the bottom of the sock?

"A. It was in perfect condition.

"Q. It was in perfect condition?

"A. Yes, sir.

"Q. Were there any holes in it?

"A. No, sir.

"Q. Was it worn?

"A. No, sir.

"Q. Was there any sand or gravel on the bottom?

"A. No, sir.

"Q. What about the condition of the river bank along there?

"A. It is quite brushy."

In our opinion the condition of the land and the pregnant fact that the sock worn by Cox was in perfect condition when the body was removed from the river demonstrate that Cox could not have made the journey from the blood spot in the road to the river without the sock showing a worn condition.

By returning a verdict of murder in the second degree, the jury must have taken into consideration the condition of mind the accused was in when he learned of the insults offered by Cox to his mother. While language, however grievous and insulting, can never justify an assault, such language does ofttimes afford a motive for the wreaking of vengeance.

No witness has taken the stand to refute the case

of the Commonwealth. The only reliance of the accused is that the Commonwealth has failed to make out a case against him. If that be true, he is entitled to an acquittal. However, our view is that the Commonwealth has successfully borne the burden of establishing the guilt of the accused beyond any reasonable doubt. Here, as in the *Dean Case, supra,* "we have a case of circumstantial evidence, where time, place, motive, means and conduct concur in pointing out the accused as the perpetrator of the crime." There is not a vestige of evidence which points to any other criminal agent. The testimony of witnesses and the physical facts lead to but one logical conclusion, that accused is guilty.

It is assigned as error that the court, over the objection of the accused, gave this instruction:

"The court instructs the jury that if they believe from the evidence beyond a reasonable doubt that George Clarke became mad because of what his mother told him Ned Cox had done at the Clarke home, and that thereupon George Clarke went up the road and overtook Cox and beat him and left him lying by the side of the road, and then immediately returned home and got his mother and he with his mother went up to where Cox was on the side of the road, and that he, George Clarke alone, or with his mother, wilfully, deliberately, premeditatedly and of his malice aforethought put Cox in the river and thereby drowned him, you should find George Clarke guilty of murder in the first degree."

The fact that the jury returned a verdict of murder in the second degree is a sufficient demonstration that the jury could not have been influenced by the instruction. The question raised is a moot question and no discussion of it is deemed necessary.

The last assignment of error relates to the giving and refusing of certain instructions.

On motion of the defendant, the court gave the following instructions:

"The court instructs the jury that the law presumes the accused to be innocent until he is proven guilty beyond a reasonable doubt, and if there is upon the minds of the jury any reasonable doubt of the guilt of the accused, the law makes it their duty to acquit him, and that mere suspicion of probability of his guilt, however strong, is not sufficient to convict, nor is it sufficient if the greater weight or preponderance of the evidence supports the charge in the indictment, but to warrant his conviction his guilt must be proved by the evidence beyond a reasonable doubt.

"The court instructs the jury that in the eyes of the law every man is presumed to be innocent until he is proved guilty, and not only is the burden of proving the guilt of the person charged with the crime on the Commonwealth, but to warrant conviction the guilt of the accused must be proved to the exclusion of every reasonable doubt.  And the court tells the jury that this presumption of innocence, unless rebutted by the Commonwealth, if so rebutted, goes with the prisoner throughout the entire trial and applies at every stage thereof.

"The court instructs the jury that the failure of the accused to testify creates no presumption against him; and in considering his guilt or innocence his failure to testify is not a circumstance which the jury is entitled to consider.

"The jury are instructed that circumstantial evidence must always be scanned with great caution and can never justify a verdict of guilty, especially of an offense the penalty of which may be death, unless the circumstances proven are of such a character and tendency as to produce in a fair and unprejudiced mind a moral conviction of the guilt of the accused beyond all reasonable doubt, and unless the jury believe from the evidence that each and every circumstance essential to the conviction of the accused has been made out and established beyond a

reasonable doubt, then the accused should be found not guilty."

The court over the objection of the accused, amended this instruction offered by the accused:

"The court instructs the jury that the law presumes the accused to be innocent until he is proven guilty beyond a reasonable doubt, and if there is upon the minds of the jury any reasonable doubt of the guilt of the accused, the law makes it their duty to acquit him, and that mere suspicion of probability of his guilt, however strong, is not sufficient to convict, nor is it sufficient if the greater weight or preponderance of the evidence supports the charge in the indictment, but to warrant his conviction his guilt must be proved *so clearly that there is no reasonable theory consistent with the evidence upon which he can be innocent.*"

In amending the instruction the court struck out the italicized language and added the words, "by the evidence beyond a reasonable doubt."

The instruction, as offered, embodied a correct statement of the law, and was approved in *Brown's Case,* 97 Va. 791, 792, 34 S. E. 882. The same principle, however, was stated in another instruction given on motion of the accused. The amendment could not, we think, have misled the jury, and, in any event, constitutes harmless error.

We find no error in the judgment of the trial court and it is therefore affirmed.

*Affirmed.*