# Richmond

## MYRTLE STOOTS ORANGE v. COMMONWEALTH OF VIRGINIA.

October 9, 1950.

Record No. 3714.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*Garnett S. Moore*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General*, and *Frederick T. Gray, Assistant Attorney General*, for the Common-wealth.

BUCHANAN, J., delivered the opinion of the court.

Myrtle Stoots Orange, referred to herein as defendant, has been convicted of second-degree murder and sentenced to serve fifteen years in the penitentiary for the killing of Charles Lewis McFall. The evidence against her is circumstantial and she here challenges its sufficiency to support the verdict, as well as certain rulings of the trial court in admitting and rejecting evidence and in giving and refusing instructions.

She was indicted February 21, 1949, jointly with her brother, Frank Stoots, and her nephew, LeRoy Stoots.* On her statement that she was without means to employ counsel, the court immediately appointed counsel for her, and he has conducted her defense with energy and ability

---

*As the indictment appears in the printed record the names of the parties charged are omitted. Inspection of the original indictment, which we have brought here, shows that the defendants were properly named therein, the body of the original indictment being as follows:

"The GRAND JURORS of the COMMONWEALTH OF VIRGINIA, in and for the body of the COUNTY of PULASKI, and now attending its Circuit Court at the FEBRUARY TERM, 1949, upon their oaths, do present that MYRTLE STOOTS ORANGE, FRANK LEE STOOTS and CLINTON LEROY STOOTS on the 13th day of February, 1949, in the said County of Pulaski, did then and there unlawfully and feloniously, and of their malice aforethought, kill and murder one Charles Lewis McFall, against the peace and dignity of the Commonwealth."

both in the trial court and in this court. She elected to be tried separately and after a trial lasting three days she was convicted by a jury and sentenced as stated. Frank Stoots and LeRoy Stoots testified as witnesses for the Commonwealth.

The sufficiency of the evidence against her was challenged first by a motion to strike at the conclusion of the Commonwealth's evidence and again at the conclusion of all the evidence. The defendant lost her right to rely on her motion to strike at the conclusion of the Commonwealth's evidence by afterwards introducing her own. *Spangler* v. *Commonwealth*, 188 Va. 436, 438, 50 S. E. (2d) 265, 266; *Interstate Veneer Co.* v. *Edwards, ante,* pp. 107, 110, 60 S. E. (2d) 4, 6. The sufficiency of the evidence to support the verdict is therefore, to be determined from the entire record.

McFall's body was found on Sunday afternoon, February 13, 1949, about five o'clock, in a cistern in his back yard. His throat had been cut, the external jugular vein had been severed and his death resulted from the hemorrhage. An autopsy showed there was no water in his lungs and the coroner was of opinion that necessarily he was dead when his body entered the cistern, which held about eight feet of water.

McFall, who was fifty-three years old and unmarried, lived in a three-room house on State Route 99 about two miles east of the town of Pulaski. The defendant, who was thirty-six, was married but living apart from her husband. She lived with her father and mother, her brother Frank and her nephew LeRoy, in a house on the same road about a quarter of a mile west of the McFall house. Her acquaintance with McFall began December 18, 1948, about two months before his death. A colored girl who knew him took the defendant to his house that afternoon. The three began drinking and during the evening two colored men joined the party, one of whom, Robert Jones, had some sort of difficulty with defendant, hit her and blacked her eye. The colored people later left and the defendant spent the night

with McFall. Thereafter defendant regularly went to Mc-Fall's house and stayed with him over the week-ends, drinking with him, cooking his meals and sleeping with him. LeRoy Stoots, defendant's nephew, spent one of these week-ends with defendant and McFall.

Customarily, the defendant went to McFall's home on Friday. The week-end of this tragedy started a day earlier. McFall picked defendant up at her home on Thursday and she stayed with him all of Friday and Friday night. Saturday morning McFall told the defendant, so she testified, that he was going to town to get some money. He shaved, after asking her whether he needed to. He then went to town and borrowed $150 from a small loan company and as security a life insurance policy was issued to him naming Myrtle McFall, who he said was his wife, as second beneficiary. He also stated that he had $4,000 of life insurance, payable to his wife Myrtle. She testified that he talked that morning about taking her to Michigan and had talked of taking her to Richmond to have her tonsils taken out. He told her that on this trip he had gone by his homeplace and got a gun, stating that he might need it. Later in the afternoon he went out on the porch and fired the pistol, which was what she referred to as a gun, and then gave it to her along with some shells which she put in her pocketbook. She testified that she kept the shells in her pocketbook and hid the pistol in a potato sack in the kitchen early Sunday morning because he had threatened her and she was afraid. Still later Saturday afternoon they walked to Morris' service station, about a mile and a half east of McFall's house, where McFall paid a grocery bill and bought two pints of whiskey. They had been drinking and McFall drank on the way home. She said she had to help him back home and into bed.

Frank and LeRoy Stoots, witnesses for the Commonwealth, testified that they went to the McFall house Sunday morning, February 13, about nine-thirty or ten o'clock, to get a drink. McFall got up and let them in. Defendant was

still in bed. They were there twenty or thirty minutes and the four of them drank a pint of liquor and a quart of beer. McFall and defendant appeared to have been drinking already. McFall asked them to go to Morris' and see if they could find his pocketbook, which he thought he had left there the night before. Defendant suggested that McFall go with them. He thereupon put on khaki pants and shirt, went into the kitchen and came back into the bedroom. Defendant had her pocketbook under the pillow and McFall tried to get it but she lay down on it. He then went back into the kitchen while Frank and LeRoy waited for him at the road. He came out and told them to go ahead and he would get Myrtle up and get some breakfast. He then went back into the house. Frank and LeRoy proceeded to Morris' and were told the pocketbook was not there. They returned to the McFall house between twelve and twelve-thirty, approaching from the back. They saw the defendant standing on the back porch, dressed only in her slip, bleeding from the head and very bloody. The cover was off of the cistern and there were drops of blood on it and spots of blood from the back porch across the concrete top of the cistern. LeRoy started away and defendant holloed to him three times to come back there a minute, but he ran back toward the railroad and into the highway. In the meantime, he said, he had looked down into the cistern and put the top back on.

Frank testified that he went up to his sister and asked what had happened. She said, "He tried to kill us." He inquired, "Who?" She said, "Charlie." He asked, "Where is he then?" She said, "I don't know." He testified that her head was "beat up" and she was bloody. He went into the house and found blood "all over the place." He saw nobody but the defendant. Up to the time of his so testifying he had denied positively that he went into the house. He and LeRoy went back to their home and forty-five minutes to an hour later the defendant came there.

The defendant, testifying for herself, gave this version:

When McFall came back to the house she was standing in the middle of the floor. She told him she thought he was going to see about his pocketbook. He replied that he told the boys to get it and to bring back some liquor. She told him he ought to have gone. He replied that he had changed his mind, and "in the meantime, I got a job to do." With that he pulled the pistol out of his pocket, put it in her ribs and snapped it, saying, "We are going away from here. I ain't leaving you for no son-of-a-bitch." Up to that time there had been no argument of any kind. He asked her where his shells were and she said she had lost them. She was scared and sat down on the foot of the bed, and "that is when he busted my ear open." She said he hit her on the side of the head, holding the pistol flat in his hand, saying, "We are going away from here today, not no goddam tomorrow." He hit her about three times with the pistol, she said, and then jerked her off of the bed and she thought he kicked her in the ribs. She fell on her right side on the floor at the foot of the bed. She said she did not remember his hitting her with anything but the pistol but that he said to her, "If I can't kill you with this, I know what I can kill you with." He then went toward the kitchen, she thought to get the axe, and that was the last time she ever saw him. She recalled, she said, "a faint memory of scrambling around in the floor trying to get up * * trying to pull up by the foot of the bed," and that she remembered putting on a brown skirt. She was asked if she saw Frank and LeRoy. She replied, "I haven't seen nothing."

Neighbors living across the road in front of the McFall house saw her leaving the house—one of them said 'about eleven-fifteen and the other placed it between twelve and one. She came around from the back of the house. Both said she had on a white coat. She did not stagger but walked in an ordinary way. They afterwards saw no other person come in or go out of the house until the officers came.

Defendant said she guessed McFall was alive when she left the house.

At 12:40 p. m. somebody telephoned a town officer that a girl was walking along the highway who had either been struck by a car or severely beaten. He found the defendant going through a field toward her home. She was bloody and staggering along. The light coat she was wearing was covered with blood. He followed her home and found Frank and LeRoy there. She told the officer that McFall had beaten her with an axe.

Later that day the defendant was admitted to the hospital. Examination showed that she had a lacerated wound about three-fourths inch long in her right temple area, a number of lacerations on the left side of her face and ear and a small laceration on her left thumb; contusions on her left jaw and one on the lower part of her back. Her jaw was broken and she had a facial paralysis due to a severed nerve. She was in the hospital about twenty-five days. The doctor testified that she had had no severe loss of blood and her blood pressure and pulse showed that she was not in severe shock but probably in moderate shock.

About two o'clock that afternoon the sheriff went to the McFall house looking for McFall. He found "right much blood in the house" but nobody was there. He later returned around five o'clock with one of his deputies. No change in the condition of the house had occurred in the meantime and a number of pictures were taken of the bedroom, the kitchen, the cistern and of the body of McFall being removed from the cistern. These were filed in evidence. By them and the testimony of the officers it is shown that on the floor toward the foot of the bed, which had not been made up, were spots of blood, while the pillow at the head of the bed was very bloody, at least half of it appeared to be soaked with blood. In the kitchen there was blood on the floor, on the wall and on the frame of the door leading to the back porch, both spots and smears. There were some spots of blood on the back porch, the

outside walkway and on top of the cistern. This cistern was five or six feet from the house. The porch was two or three feet high, with steps to the ground. In the cement top or roof of the cistern was an opening for which there was a movable wooden cover. There were spots of blood on the top of the cistern and on the cover. A washpan containing bloody water was on the kitchen table. Apparently two people had eaten in the kitchen and the dishes had not been cleared away. A chair near the foot of the bed was turned over but otherwise there was no sign of a fight or struggle either in the house or outside.

By using a strip of lumber it was discovered that there was something in the bottom of the cistern and McFall's body was pulled out feet first. The picture shows a deep cut apparently straight across under his chin. There was no blood on his cloths but a splotch of what would appear to be dried blood on his chest at the base of his neck.

There were two cuts on his neck made by a sharp instrument, one above the other. The upper one was superficial and about three inches long. The lower one was six inches long and severed the external jugular vein. There would be no spurting of blood from this severed vein but there would be profuse bleeding, causing death in a short time, so the coroner testified. He further testified, on cross-examination, that after such a wound McFall could not have moved very far; that he might stagger a step or two.

On the kitchen wall near the door leading from the bedroom there was a medicine cabinet, on the front of which was a mirror, and on this, as well as on the wall around it, there were smears and drops of blood. In the cabinet was found a straight razor on which were blood stains of recent origin. A revolver was found behind the radio in the bedroom, loaded. One of the cartridges had been fired and it was jammed. There were some blood stains on top of the hammer and a little bit of hair. There was a hatchet or axe under the table on the back porch. There were no blood

stains on the head of the hatchet but the handle appeared to have been handled with a bloody hand and there was some spattered blood on it. Efforts to develop fingerprints on all of these articles were unsuccessful.

The defendant contends first that this and other evidence to be referred to is insufficient to exclude the hypothesis of suicide and hence to establish the *corpus delicti.*

It is not necessary that the evidence eliminate every possibility of suicide. Criminal agency as the cause of death as well as the identity of the agent may be established by circumstantial evidence if sufficient to produce the full assurance of moral certainty on the subject. *Smith* v. *Commonwealth*, 185 Va. 800, 815, 40 S. E. (2d) 273, 280; *Bowie* v. *Commonwealth*, 184 Va. 381, 389, 35 S. E. (2d) 345, 349.

" 'Where there is evidence tending to criminate, the jury is almost uncontrollably the judge of its force and weight and of the proper inferences from the facts proven.' " *Williams* v. *Commonwealth*, 130 Va. 778, 782, 107 S. E. 655, 656.

The defendant argues the suicide theory from evidence that McFall had been drinking excessively, that he was jealous of her and frustrated in a desire to marry her by her undivorced status, and that he told friends that he might not come to work Monday or they might never see him again. The evidence relied on is not persuasive and clearly such force as it has is dissipated by other evidence and the physical facts.

On Saturday afternoon he borrowed $150, which he would not have needed if he expected to commit suicide next morning. When he paid his bill to Morris Saturday night he said if he owed more he would pay it the next time he came down. He could not have cut his own throat with the razor while standing in front of the mirror, as defendant suggests, without having blood down his front. Neither could he have cut his throat while lying on the bed, replaced the razor in the cabinet and then walked to the cistern, removed the lid and secreted his body in its eight feet

of water. The evidence leaves no room for reasonable doubt that McFall's death was caused by the criminal agency of another. *Belote* v. *Commonwealth*, 135 Va. 468, 470, 115 S. E. 520, 521.

Is it sufficient also to support the finding of the jury that the defendant was the criminal agent?

The case of *Dean* v. *Commonwealth*, 32 Gratt. (73 Va.) 912, has long been recognized as a classic on the subject of circumstantial evidence. The familiar principle was there stated that circumstantial evidence must always be scanned with great caution and never justifies a verdict of guilty unless the circumstances are of such character and tendency as to produce upon a fair and unprejudiced mind a moral conviction of the guilt of the accused beyond all reasonable doubt. Added, however, was the caution that crimes are sometimes committed with such secrecy that to require the production of an eye-witness would be to defeat public justice and to permit the most heinous crimes to go unpunished. It was there stated:

"Where all the circumstances of *time, place, motive, means, opportunity and conduct,* concur in pointing out the accused as the perpetrator of the crime, it must produce a moral, if not absolute, certainty of his guilt." 73 Va. at p. 924. And when these concur, "the evidence is powerfully strengthened by the total absence of any trace or vestige of any other agent. 1 Stark. 494." 73 Va. at p. 926.

There is no dispute in this evidence that the time, place and means were available to the defendant for committing this crime. That much is not denied. All who speak say she was there alone with McFall when he was last seen alive. She herself so testified, as did Frank and LeRoy Stoots. Their visit to the McFall house that morning and their visit to the Morris service station are well established. Defendant says in her brief that there is no dispute about the boys leaving McFall's and that several people saw them on their way to Morris' and coming back. She specifically testified that on that Sunday morning there was "nobody

present but us four," referring to herself, McFall, Frank and LeRoy; and again that "there was nobody there but Charlie and I."

There is no reasonable doubt that his throat was cut with the razor which she saw him shaving with that morning and which was found in the medicine cabinet with fresh blood on it after he was killed. She testified that she was sitting at the foot of the bed when he struck her with the pistol and then jerked her off on to the floor where she fell on her right side. She made no claim that she was ever back on the bed. The blood-covered pillow at the head of the bed could not have been from her blood.

There is no doubt that he beat her severely. His reason for doing so is not certain from the evidence. It is clear that he was drunk and had been drinking for several days. She stated that to be true. If he had wanted to kill her as she said he threatened to do, ample means were at hand and there was nobody to prevent. His anger may have been caused by a belief that she had taken his money. He wanted to look into her pocketbook for some purpose. The pocketbook that Frank and LeRoy went to look for at Morris' was found by the officers in a dresser drawer in the room adjoining the bedroom with $76 in it. It would have been no more difficult for him to locate had it been there when he was looking for it. He may have been excited to his act by the jealousy she said he had—a frequent product of such unhallowed relations. Whatever the cause, the incident was soon followed by his death.

It is a most reasonable inference that McFall was killed as he lay on the bed. There is no other explanation of the blood on the pillow. The evidence is without conflict that there was no person other than the defendant with McFall until her brother and nephew came back from Morris'. She testified that she was entirely certain that they did not kill him. There was no sign of a fight or struggle in the house. The proved facts warranted an inference by

the jury that, smarting under the beating he had given her and moved by a desire for vengeance for his cruel treatment, she cut his throat with the razor while he was lying on the bed, probably asleep or stupid from the effects of his drinking.

The blood on her could not have all come from her own wounds. Except for the small cut on the right temple, all of her cuts and contusions were on her left side. Yet the deputy sheriff who examined her clothing testified, without contradiction, that her clothing was completely saturated with blood on the right and very little was sprinkled on the left.

Whether she alone hid the body in the cistern is open to question. It was not necessary for the Commonwealth to prove that she did. McFall was dead when that was done. We cannot say that it was impossible. The evidence does not speak as to her size and strength. The jury saw her and they also had a view of the premises. They could have concluded that she did. Her brother Frank admitted that he went into the house after Leroy had left. He had previously denied doing so. The inferences from that were for the jury.

The testimony of the defendant is not convincing to read, and evidently was not convincing to hear. There were discrepancies in it. But more serious were her conflicting statements as to material facts. She testified, as stated, that she did not see, or remember seeing, Frank or LeRoy after they came back from Morris'. But several days after McFall's death, and while she was in the hospital, she stated to the deputy sheriff that she did see Frank and LeRoy after they returned and after she was beaten up; that she had not even washed the blood off then; that after they came back they came into the house and had a drink with McFall; that she asked them whether they had found the pocketbook and they said no. She said they did not mention her being

beaten up. She guessed they were afraid it would start all over again.

At a later time, after she had been permitted to see her mother and to read the newspaper accounts, including statements by Frank and LeRoy, she told the deputy sheriff that she left Frank and LeRoy at the house after telling them that McFall had beaten her, and that when she last saw them, one of them was heading for the back door and one for the front door. He testified that her statements to him varied. First she said she did not see Frank and LeRoy and they did not come back to the house. Later she said they did come to the house and into the house, inferring that she left McFall alone with them there.

In *Toler* v. *Commonwealth*, 188 Va. 774, 781, 51 S. E. (2d) 210, 213, we said that "where a conviction rests upon circumstantial evidence, much weight is given to contradictory statements of material facts by the accused." This also that was written in that case is quite applicable here: "Where, after a fair trial, the jury has found a verdict of guilty and the circumstances proven are of such character as to warrant that finding, a motion to set aside the verdict on the ground that it is contrary to the evidence should be granted only when 'it appears from the evidence that such judgment is plainly wrong or without evidence to support it.' Virginia Code, 1942 (Michie), section 6363."

■ The verdict in this case was adequately supported by the evidence. Here, as in the *Dean Case*, time, place, motive, means, opportunity and conduct concur in pointing out the accused as the perpetrator of the crime.

The cases of *Smith* v. *Commonwealth, supra; Garner* v. *Commonwealth*, 186 Va. 600, 43 S. E. (2d) 911; *Thomas* v. *Commonwealth*, 187 Va. 265, 46 S. E. (2d) 388; *Holland* v. *Commonwealth*, 190 Va. 32, 55 S. E. (2d) 437, relied on by the defendant, differ importantly from this case in their facts. In the *Smith Case* it was admitted that the defendant could not have committed the crime alone, and

there was no evidence that she helped do it. In the *Garner* and *Holland Cases* the evidence failed to establish that the defendants were present when the crimes were committed. In the *Thomas Case* it was said that the evidence did not establish that the defendant was the last person seen with the deceased, or that he had an opportunity to commit the crime or that his subsequent behavior was indicative of guilt.

The defendant sought to contradict the testimony elicited from the coroner on cross-examination, that McFall could only have staggered a step or two after being cut, by offering to prove that another man at another time walked farther than that after his throat was cut. It was rejected as irrelevant. The ruling was plainly correct, for the reason stated by defendant's counsel in this question to the coroner: "That, of course, would depend on the man in every circumstance?" His answer, of course, was "Yes."

The defendant also sought to introduce into evidence the questioning of the defendant in certain so-called "truth serum" tests, and the court refused to allow it. This test was made apparently on the motion of the defendant and her co-defendants, and agreed to by the Commonwealth's attorney, but with no agreement that the results should be given in evidence. These tests were made some three months after the indictment and nearly five months before the defendant was tried. The record does not show the drug that was used or the quantity of it that was administered, nor is there any evidence with respect to the value or the reliability of the tests. The answers given by the defendant are at times maudlin and at times obviously self-serving and indicative of a conscious purpose to avoid self-incrimination. Clearly the result of this test did not constitute admissible evidence. See Wigmore on Evidence, 3 ed., vol. 3, secs. 841, 998; Chicago Law Review, vol. 14, p. 601, article entitled "Legal Aspects of Drug-Induced Statements" by Leon M. Despres.

Defendant contends, also, that the statements made

by her in the hospital, above referred to, were inadmissible because she did not then have counsel, and because they were not voluntary but secured by "grilling" and while the defendant was in a state of shock and under the influence of opiates. The circumstances of the statements were carefully inquired into by the trial court before their admission and the evidence shows that the statements were freely and voluntarily made and at times when the defendant was not materially affected by shock or drug. The statements were properly admitted. See *Hampton* v. *Commonwealth*, 190 Va. 531, 551, 58 S. E. (2d) 288, 296.

The remaining assignments of error are to the granting and refusing of instructions.

Instruction B was objected to on the ground that it was so worded as to indicate that the court thought a homicide had been committed and that the Commonwealth's evidence warranted a verdict of second-degree murder. The objection is not well founded. The instruction deals with the presumption of second-degree murder following a homicide and the burden on the defendant to reduce it. It states a well-established rule, *Randolph* v. *Commonwealth*, 190 Va. 256, 262, 56 S. E. (2d) 226, 229, and adds the caution that on the whole evidence if there is reasonable doubt of guilt there must be a verdict of not guilty, and if there is doubt as to the grade of the offense, the lesser must be found.

Instruction G defines principals in the first and second degree. The defendant admits that it is a correct statement of the law but claims it is not applicable under the evidence. Its applicability sufficiently appears from the evidence stated. The defendant told the sheriff that her brother and nephew were there with McFall after the latter beat her; at another time that they were apparently looking for him when she left. Her brother testified that he was in the house after returning from Morris', having previously denied it. The defendant would have had the jury believe she was too badly injured to be able to commit the crime.

The blood on her clothing showed some participation in the affair. The objection was not well taken.

Instruction I told the jury that proof of motive was not necessary to a conviction but they might consider its absence in arriving at their verdict. Defendant objected on the ground that it was not complete, but should have added that the absence of motive affords a strong presumption of innocence. The court withheld ruling until defendant offered and was given her Instruction No. 1, telling the jury that the absence of evidence of a motive on the part of the defendant to commit the crime, "when the fact is in reasonable doubt as to who committed it," affords a strong presumption of innocence. Instruction I was then given for the Commonwealth.

The defendant was favored in the giving of these instructions. They could have given an impression to the jury that the court thought there was no evidence of motive, when in fact there was. In the *Belote Case, supra,* it was held not to be error to refuse an instruction practically identical with defendant's Instruction No. 1, on the ground that as a rule the court should not emphasize particular evidence or stress its lack, and also because there was ample evidence of motive. The same is true here and there was no error in this ruling.

Defendant next complains of Instruction J. As offered by the Commonwealth, it told the jury that circumstantial evidence was admissible to establish guilt, and if the jury believed beyond a reasonable doubt, from the facts proved and the reasonable inferences from them, that she killed McFall or aided therein, she "is guilty as charged," and if no extenuating circumstances were shown she was guilty of first-degree murder.

Defendant objected to the instruction as offered on the ground that the indictment charged first-degree murder, and the effect of the instruction would be to tell the jury that mere proof of the killing established first-degree murder,

whereas there was in fact a presumption of second-degree with the burden on the Commonwealth to elevate it to first-degree, and on the defendant to show extenuating circumstances sufficient to reduce it below second-degree. The instruction was refused as offered but it was amended by adding a paragraph stating that if extenuating circumstances negativing premeditation appeared from all the evidence, "then the defendant is guilty only of murder in the second degree, unless they believe from the evidence or have a reasonable doubt from the evidence that the defendant has reduced the offense to involuntary manslaughter, assault and battery, or not guilty."

No objection was made to the giving of the instruction after its amendment and it is to be inferred from the discussion following its being offered in its original form that as amended it was satisfactory to the defendant. Her objection now therefore comes too late. *Hampton* v. *Commonwealth, supra,* 190 Va. at p. 549, 58 S. E. (2d) at p. 295.

In addition, we think the jury could not have been misled or the defendant prejudiced by this instruction. As offered it was incorrect and the court rightly refused it. The amendment endeavored to state a correct principle but did so in a confused manner and failed to name voluntary manslaughter as one of the crimes to which the offense charged might be reduced. Instruction A-1 for the Commonwealth, however, described voluntary manslaughter and told the jury that a verdict for that offense was permissible if the evidence warranted it. There was, however, no real issue here as to the grade of the crime. The defense was that the defendant did not kill or participate in killing McFall. She did not claim it was done in self-defense or in hot blood, and there was no evidence that it was. The evidence was sufficient to establish that she killed him or aided in doing so. The Commonwealth's evidence failed to establish the details of the killing and hence to show premeditation.

The defendant made no effort to excuse her act. She claimed it was not her act. Instruction B informed the jury as to the burden of evidence once the Commonwealth had proved that the defendant committed the homicide. The jury found her guilty of second-degree murder, which was a proper verdict under the evidence. It thus definitely appears that the jury were not influenced by the reference in Instruction J to murder in the first degree. See *Clarke* v. *Commonwealth*, 159 Va. 908, 166 S. E. 541; *Jarrell* v. *Commonwealth*, 132 Va. 551, 110 S. E. 430; *Roark* v. *Commonwealth*, 182 Va. 244, 28 S. E. (2d) 693.

Finally, the defendant assigns as error the refusal of the court to give Instructions 3 and 3-a, 4 and 7.

Instructions 3 and 3-a would have told the jury that the failure of the evidence to disclose any other criminal agent was not a circumstance for them to consider. They were not applicable under the facts of this case. *Dean* v. *Commonwealth, supra*.

Instruction 4 would have told the jury that the Commonwealth must exclude the hypothesis of suicide, and all other hypotheses which were as consistent with innocence as with guilt. The jury could have understood this to mean that the Commonwealth must not only prove that the defendant killed or aided in the killing of McFall, but must affirmatively disprove all theories that might negative that conclusion. The Commonwealth does not have that burden. It is only necessary that the evidence it offers does in fact and effect exclude every reasonable hypothesis of innocence. The jury were so expressly told in this case by other instructions given both for the Commonwealth and for the defendant.

Instruction 7 would have told the jury that if somebody else killed McFall and the defendant did not participate therein, they should find her not guilty even if she helped to secrete the corpse or conceal other evidence. In view of all the other instructions given, it was not necessary

to tell the jury by this further instruction not to convict the defendant if she was not guilty.

The evidence, while circumstantial, clearly establishes the guilt of the defendant. It is wholly inconsistent with her innocence. She has had a fair trial, has had the benefit of all the safeguards which the law throws around an accused, "and there is no sound principle upon which we can disturb the verdict and judgment based thereon." *Bowie v. Commonwealth, supra,* 184 Va. at p. 393, 35 S. E. (2d) at p. 350.

The judgment of conviction is

*Affirmed.*