## Richmond

PAUL RODERICK HARRIS V. COMMONWEALTH OF VIRGINIA.

March 7, 1966.

Record No. 6131.

Present, All the Justices.

*W. Bascom Jordan*, for the plaintiff in error.

*W. P. Bagwell, Jr., Assistant Attorney General (Robert Y. Button, Attorney General,* on brief) for the Commonwealth.

SNEAD, J., delivered the opinion of the court.

The sole question presented in this appeal is whether the evidence was sufficient to sustain the conviction of Paul Roderick Harris, defendant, of statutory burglary.

Harris moved the court to strike the Commonwealth's evidence at the conclusion thereof on the ground that it was insufficient to support a finding of guilty, but the motion was overruled. Harris then rested his case without presenting evidence in his own behalf and renewed his motion to strike. The court again overruled the motion and submitted the case to the jury. A verdict was returned finding defendant guilty of statutory burglary as charged in the indictment . and fixing his punishment at two years in the penitentiary. Defendant's motion to set aside the verdict as being contrary to the law and the evidence was overruled and judgment was entered upon the verdict. We granted defendant a writ of error.

The record discloses that on Saturday, May 16, 1964, at about 3 p.m., defendant Harris, Robert Hyman, and Edith Mitchell (also known as Edith Price) approached Benjamin Parker, the operator of a gasoline station in the city of Norfolk, and asked if they could borrow his truck. Parker was acquainted with Edith Mitchell, but he did not know either Hyman or Harris by name. Parker informed them that he had sold his truck but that they could rent a vehicle at the Noble Leasing and Rental Service across the street. Edith Mitchell said that Hyman wanted to move his wife "about two hundred miles away" and requested Parker to ascertain from Noble what it would cost to rent a truck for that purpose. Parker contacted an employee of Noble and reported to the three interested persons that the rental fee would be $75. The threesome "talked among themselves" and told Parker that they would come back.

About 4 p.m. Hyman returned with the money and Parker rented a truck from Noble in his own name. It was an International "walk-in" type vehicle and was light green in color. Hyman departed and returned with defendant at approximately 5 p.m. to pick up the vehicle at Parker's station. After Parker had secured Hyman's "license number", as requested by Noble, Hyman and defendant drove off in the truck together. Parker did not observe who was driving it.

Aubrey Toone testified that on Sunday night, May 17, he was helping at a body shop in South Hill. At approximately 11 p.m. a green, "walk-in truck" stopped at the establishment. There were three men in the vehicle. Toone said, "When they come up on the

driveway, Hyman was driving and one of them was laying down and had a red blanket over him, laying on a jacket, and the other one was standing up."

Toone positively identified Hyman as the driver of the truck and described the clothes that he was wearing. He was not able to identify the man standing up in the truck at the door, but he pointed out defendant in the courtroom as being one of the three occupants of the vehicle. Before the trial he was shown photographs of Hyman and defendant which apparently aided him in making an identification of the two men. He testified:

"Q. Which one was the picture of the one lying down?
"A. Harris.
"Q. And which one was the picture of the man standing up?
"A. I didn't see that one. I just saw Hyman and Harris."

At one point in his testimony he stated that he did not know who was lying down, but at another point he said:

"A. I'd say that Harris was laying down, I mean I'm not real sure about it.
"Q. You're not real sure about it?
"A. No, I just took a glimpse of him."

Toone further testified that the truck remained at the station for about 15 minutes; that he pumped 10 gallons of gasoline into its tank; that he wrote out a cash ticket for the purchase in the amount of $3.90, and that he erroneously dated the receipt May 16 instead of May 17.

On Monday morning, May 18, between 4 and 5 o'clock, Officer H. R. Chaney was patroling Riverside Drive in Danville. He stopped his automobile on a used car lot, got out of the vehicle and stretched his legs. At that time of morning there was no traffic and "everything was perfectly quiet." Chaney heard a noise, looked across the highway, and observed a truck backed up to the loading door at the end of a building occupied by J. W. Wyatt and Company, a wholesale food distributor. Chaney became suspicious because he had "never seen a truck like that there before, and nobody at the building at that time." He drove across the highway with his lights off, "cut the motor off", and "heard a noise that sounded like somebody dropped something or somebody running, back toward the inside the building."

Chaney approached the truck, which was later positively identified as the one rented from Noble in Norfolk on the previous Saturday in the name of Parker at the instance of Hyman, Edith Mitchell and

defendant, and noticed that the rear doors and a sliding door on the driver's side were open. He observed a large quantity of "cigarettes in half cartons" which appeared "to be just thrown into the truck". Upon further inspection of the premises he also observed that the large overhanging "roll-up type door" to the building was open; that Wyatt's truck was backed up to the loading platform, and that the -entrance door to the building was open.

Chaney radioed the Danville police headquarters for assistance and three officers responded. They made a detailed check of the premises and of the two trucks. A hole about 3 feet in diameter had been knocked through the cinder block wall at the west corner of the building which gave access to the inside of the building. Another hole was found at the east end of the building, but it came to a dead end. The Wyatt company truck contained assorted merchandise. About one-half of the merchandise had been removed from the truck and placed onto the loading platform.

The rented Noble truck found just outside of the building contained, among other things, 26 half-cases of cigarettes, a blanket, a pillow, some scattered nabs, a pistol, a cash sales ticket for gasoline in the amount of $3.90 issued by the South Hill Body Shop dated May 16, and a size 7 gray hat with the initials "P H" stamped in gold on the sweatband. Both the inner lining and the band were labelled "Diamond Hatters, Norfolk, Va". According to Detective Boone "it appeared that someone had been sleeping and eating in the truck."

On Monday afternoon, May 18, (the day of the burglary) at approximately 3 o'clock, Hyman telephoned Benjamin Parker in Norfolk, informed him that the truck had been stolen, and told him to report the theft to the rental company. Parker promptly made the report to an employee of the company, and about 25 minutes later Hyman and Harris, the defendant, appeared at Parker's station and asked him what the rental company had said about the truck being stolen. Parker replied that nothing had been said.

The next day, May 19, at about 12:20 p.m. Harris, Hyman, and Garland Turner were riding in a late model Cadillac automobile and were arrested by Sergeant Hurst near the home of Edith Mitchell, defendant's girl friend, in Norfolk. The Norfolk police had received certain information from the Danville authorities and were on the "lookout for Harris". After Harris was placed in Hurst's police car, he asked for his hat which he had left in the Cadillac. Hurst knew that the Danville police were looking for "a particular hat with particular initials in it". He went to the car, secured defendant's hat

(brown in color), looked at it "real quick", saw that it had the initials "P H" stamped in it, and gave it to defendant.

Harris was then transferred to patrol wagon 39 and transported to police headquarters. Upon arrival he was asked to place his hat upon a rack in the hall. While he was in one of the rooms of the Detective Bureau, Hurst and two Danville detectives examined the hat and found that "the whole inside of the hat, the hatband and everything, had been torn out." Harris was asked what had happened to the inside of his hat and he replied: "I don't know what you're talking about." He said that "nothing had happened, that he hadn't done anything to it."

Sergeant Hurst then went back to patrol wagon 39 and found "the inside of a hat" stuffed beneath the seat in the place "where they keep the stretcher." The sweatband of the hat was stamped in gold with the initials "P H". The band and the inner lining each bore the name of "Diamond Hatters, Norfolk, Va." A tag showed that the hat was a size 7. Defendant had been transported alone in the patrol wagon, and no one else had been in the vehicle since his arrest. Sergeant Hurst showed the band and inner lining of the hat to defendant and told him that he had found them in the patrol wagon. Defendant said, "So what, what does that prove?"

Defendant was also questioned about his use of the Noble truck, but he denied that he ever used the vehicle or that he knew anything about it. He stated that he had never been in the truck; that he had never been to Benjamin Parker's service station, and that he had never been in Danville.

Benjamin Parker testified that about a week after Hyman had reported that the truck had been stolen defendant came by the service station again. On this occasion Harris told Parker that he [Parker] "wasn't coming to Court and testify against him"; that "they was going to kill" him, and that he [Harris] "wont no small time operator that he was a big time operator."

Defendant contends, *inter alia,* that the evidence against him was entirely circumstantial; that there was no evidence placing him at the scene of the crime; that there was no proof that he had purchased the hat found in the rented Noble truck or that the hat had ever been in his possession; that the initials "P H" were in no way peculiar to him, and that even if it was established that the hat belonged to him, he could easily have left it in the truck while it was in Norfolk.

He further argues that the evidence was not sufficient to show that he was in South Hill, "much less in Danville"; that his threat to

Benjamin Parker, the service station operator, could have reference to the fact that the truck for which he was partly responsible had been reported stolen, and that his denial of certain facts during his interrogation by the police had no probative value against him.

In short, defendant contends that the Commonwealth's evidence "outlines only a series of highly suspicious circumstances which do not amount to proof beyond a reasonable doubt so as to overcome the presumption of innocence."

In *Toler* v. *Commonwealth,* 188 Va. 774, 780, 781, 51 S.E. 2d 210, Mr. Justice Spratley, speaking for the court, discussed various principles applicable to a conviction based upon circumstantial evidence. The opinion reads in part:

"It is true that the conviction of the defendant is based upon circumstantial evidence. While such evidence should be received with caution, it is legal and competent and entitled to the same weight as direct testimony if it is of such a convincing character as to exclude every reasonable hypothesis other that (sic) that the accused is guilty. It is often the only evidence which the nature of the case permits, and we have a rule of necessity that whatever may be established by direct evidence in a criminal case may also be established by circumstantial evidence. A circumstantial fact is admitted on the basis of an inference when the inference is a probable explanation of another fact and a more probable and natural one than other explanations, if any. Evidence is seldom sufficient to establish any fact as demonstrated and beyond all doubt. (Citing cases and authorities.)

"In Virginia, the weight of the evidence or the inferences to be drawn from circumstances, is always a matter for the jury, under propoer (sic) instructions from the court. When the circumstances lead to a satisfactory and certain conclusion to the exclusion of every reasonable hypothesis of innocence, this is sufficient to support a verdict of guilty. Where, after a fair trial, the jury has found a verdict of guilty and the circumstances proven are of such character as to warrant that finding, a motion to set aside the verdict on the ground that it is contrary to the evidence should be granted only when 'it appears from the evidence that such judgment is plainly wrong or without evidence to support it.' Virginia Code, 1942 (Michie), section 6363. [now § 8-491, Code 1950].

"In all cases of circumstantial evidence the conduct of the accused is always an important factor in the estimate of the weight of circumstances which point to his guilt. Where a conviction rests upon circumstantial evidence, much weight is given to contradictory state-

ments of material facts by the accused. Each should be considered along with the other facts and circumstances shown in evidence to determine whether, upon the whole case, the evidence excludes every reasonable hypothesis consistent with the accused's innocence. *Massie* v. *Commonwealth*, 140 Va. 557, 125 S.E. 146. See also, *Dean* v. *Commonwealth*, 32 Gratt. (73 Va.) 912, 924."

For later cases embodying one or more of the above principles, see *Orange* v. *Commonwealth*, 191 Va. 423, 61 S.E. 2d 267; *Wright* v. *Commonwealth*, 196 Va. 132, 82 S.E. 2d 603; *Crisman* v. *Commonwealth*, 197 Va. 17, 87 S.E. 2d 796; *Tinsley* v. *City of Richmond*, 202 Va. 707, 119 S.E. 2d 488; *Miles* v. *Commonwealth*, 205 Va. 462, 138 S.E. 2d 22.

When the evidence adduced in the case at bar is considered in the light of the foregoing principles it becomes apparent that it was sufficient to sustain a conviction of defendant for statutory burglary. In the first place, the evidence established that defendant was present at Parker's service station when negotiations were made for the rental of the Noble truck on May 16, 1964. Although Parker told Harris and his two companions that they could rent the truck from Noble "just as good as I could", they asked Parker to make the arrangements and subsequently paid him for his services. All they had to do was to walk across the street to make arrangements for themselves instead of persuading a third party to rent the truck. This course of conduct was unusual and tends to indicate that the vehicle was to be used for an unlawful purpose. Edith Mitchell told Parker that Hyman needed the truck to move his wife "about two hundred miles away", and we may take judicial notice of the fact that Danville is approximately that distance from Norfolk. *Hart* v. *Commonwealth*, 131 Va. 726, 735 *et seq.*, 109 S.E. 582; *Omohundro* v. *Palmer*, 158 Va. 693, 697, 164 S.E. 541; 7 M.J., Evidence § 12, p. 343. After Parker had rented the truck, Hyman and defendant took possession of it and drove off in it together.

The Noble truck was next seen the following night about 11 p.m. in South Hill by Toone, an attendant at the South Hill Body Shop. South Hill is approximately 80 miles from Danville and is situated on the highway between Norfolk and Danville. Toone positively identified Hyman as the driver of the vehicle and named defendant as the person who was lying beneath a blanket inside the truck. He pointed out defendant in the courtroom as being one of the three occupants of the vehicle. It is true that he was "not real sure" about his identification of defendant, but his testimony as a whole was sufficient

to permit the jury to find that defendant was in fact an occupant of the truck in South Hill. "* * * A witness need not be positive, excluding all doubt, in his statement. He may state facts to the best of his knowledge, or his best impressions even, and the weight of his evidence is a matter for the jury." 7 M.J., Evidence, § 283, p. 672.

About 5 or 6 hours after the Noble truck was seen in South Hill, it was found abandoned at the scene of the crime in Danville. It was partially loaded with merchandise taken from the Wyatt company. Officer Chaney stated that he "heard a noise that sounded like somebody dropped something or somebody running," and it is obvious that he came upon the scene while the burglary was being committed. The officers found in the truck, among other things, a blanket, the cash sales ticket for gasoline which had been issued by Toone the night before, and a size 7 gray hat containing the initials "P H" and labelled "Diamond Hatters, Norfolk, Va."

The Noble truck was reported as stolen to Parker in Norfolk about 3 p.m. on the day of the burglary. Harris contacted Parker in person about 25 minutes later, and he had ample time to reach Norfolk from Danville after the burglary was interrupted so as to be able to do so.

After Harris was arrested on the day following the crime and while he was being transported to police headquarters he tore the sweatband and the inner lining from the hat he was wearing and hid them in the patrol wagon. This hat and and the hat found in the Noble truck in Danville at the scene of the crime were introduced in evidence as exhibits. The hats are identical except for the fact that one is gray and the other is brown. Both are size 7, contain the initials "P H", and are labelled "Diamond Hatters, Norfolk, Va." They are the same style and shape, are creased in the same manner and bear the same unusual heavy, decorative stitching on their brims. It is reasonable to infer that defendant tore the sweatband and inner lining from the brown hat he was wearing at the time of his arrest because he knew they were identical to the band and lining of his gray hat left in the Noble truck; that they would tend to show that he was at the scene of the crime, and that they would constitute damaging evidence against him.

It is significant that defendant denied to an investigating officer that he ever used the Noble truck or knew anything about it. He told the officer that he had never been in the truck or to Parker's service station. These denials were in direct conflict with the testimony of both Parker and Toone. Moreover, defendant threatened

Parker's life in an attempt to prevent Parker from testifying against him at the trial.

Under the evidence, the jury could have properly concluded that the circumstances of time, place, motive, means, opportunity and conduct concurred in pointing out defendant as a perpetrator of the crime and that every reasonable hypothesis consistent with his innocence was excluded. Thus, we cannot say that the judgment was plainly wrong or without evidence to support it.

Defendant relies upon *Johnson* v. *Commonwealth*, 29 Gratt. (70 Va.) 796; *Bundick* v. *Commonwealth*, 97 Va. 783, 34 S.E. 454; and *Leebrick* v. *Commonwealth*, 198 Va. 365, 94 S.E. 2d 212 to support his position that the evidence was insufficient to sustain a conviction. Suffice it to say that these cases are factually distinguishable from the instant case and are therefore not controlling.

We hold that the evidence was sufficient to sustain defendant's conviction, and the judgment appealed from is affirmed. A fee of $200 is allowed counsel for the indigent defendant for prosecuting this appeal.

*Affirmed.*