UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Kelsey, Alston and Decker
Argued at Alexandria, Virginia

RENE MARTINEZ ROMERO

                                          MEMORANDUM OPINION* BY
v.      Record No. 0050-13-4               JUDGE D. ARTHUR KELSEY
                                              MARCH 25, 2014

COMMONWEALTH OF VIRGINIA

        FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                      Craig D. Johnston, Judge

        Andrew T. Elders (Sarah C. Bruns; Elders, Zinicola &
        Blanch, PLLC, on brief), for appellant.

        Aaron J. Campbell, Assistant Attorney General (Kenneth
        T. Cuccinelli, II, Attorney General, on brief), for appellee.


        A jury convicted Rene Martinez Romero of raping his mentally disabled daughter. On

appeal, he claims that his conviction should be overturned on various grounds, including

factually insufficient proof of guilt, lack of jurisdiction and improper venue, inadequate

disclosure by the Commonwealth of exculpatory evidence, and potential juror misconduct.

Finding no merit in any of these assertions, we affirm.


                                          I.

        On appeal, we review the evidence in the "light most favorable" to the Commonwealth.

Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003). This principle

requires us to "discard the evidence of the accused in conflict with that of the Commonwealth,

and regard as true all the credible evidence favorable to the Commonwealth and all fair

inferences to be drawn therefrom." Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755,

759 (1980) (emphasis and internal quotation marks omitted).

_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

In addition, "an appellate court's 'examination is not limited to the evidence mentioned by a party in trial argument or by the trial court in its ruling.'" Perry v. Commonwealth, 280 Va. 572, 580, 701 S.E.2d 431, 436 (2010) (quoting Bolden v. Commonwealth, 275 Va. 144, 147, 654 S.E.2d 584, 586 (2008)). Instead, "an appellate court must consider all the evidence admitted at trial that is contained in the record." Id.; see also Hamilton v. Commonwealth, 279 Va. 94, 103, 688 S.E.2d 168, 173 (2010).

## A. THE EVIDENCE AT TRIAL

A medical test in November 2010 revealed that appellant's daughter, D.M., was pregnant. She was eighteen years old at the time, severely mentally disabled, and prone to seizures. One expert at trial placed her educational competency level to be "approximately kindergarten level." App. at 605. During an evaluation by a school psychologist, D.M. could not provide her date of birth or "any family information." Id. at 600-01. She could not "recognize letters" of the alphabet or "identify them, in order or out of order." Id. at 601. Given D.M.'s condition, she could not be left alone at home.

Medical testimony established the date of conception to be in August 2010. At that time, D.M. lived at home in Prince William County with appellant (her father), Celina Castillo Martinez (her mother), and her six-year-old sister. D.M. had a separate bedroom. In August 2010, her mother worked two jobs, one from home in the mornings and another away from home three nights a week. On the way to her evening job, usually at about 3:00 p.m., the mother would take D.M. and her younger sister to the home of Roque and Dennis ("Denny") Martinez (appellant's brother and nephew) in Alexandria. While there, Denny Martinez's mother or another female friend of the family would babysit D.M. until appellant arrived at 7:00 p.m. to take the girls home. Appellant would be alone at home with the two girls until his wife returned from work sometime after 10:45 p.m.

On four occasions in August 2010, appellant took D.M. and her younger sister to visit her mother's cousin in Maryland. Her mother accompanied them on some of these trips. None of the trips involved an overnight stay. No evidence suggested that appellant or any other male relative was ever alone with D.M. during any of these day trips.

After D.M.'s unborn child was aborted, a sexual-assault nurse examiner took samples of fetal tissue for DNA testing. Investigators also asked for and received saliva samples from appellant. The Commonwealth's experts at trial testified that the fetal DNA tests proved there was a 99.9999% probability that appellant was the biological father of D.M.'s child when compared to any unrelated, randomly selected men. Id. at 1371, 1902; see also id. at 1896-97 (testing by a private laboratory showing that appellant's "Probability of Paternity is 99.99% compared to an unrelated, untested man in the Hispanic population").

Officials obtained DNA samples from all other related males who may have spent time with D.M., and DNA tests proved that none of them could have fathered the child. The testing specifically excluded appellant's brothers (Roque and Felix Martinez) and his nephew (Denny Martinez), as well as three other men who were unrelated to appellant, "because they each do not possess an obligate paternal allele at three or more genetic systems." Id. at 1896-97. The DNA certificates of analysis summarizing these conclusions were admitted into evidence without objection.

D.M. testified at trial. Her disability, however, prevented her from communicating intelligently. She was unable to state her full name or her correct birthday and age. She gave a nonsensical answer when asked what the word sex meant. She said she did not know what a man or boy did with a penis and did not recall ever seeing her father's penis.

Appellant took the stand in his own defense. Among other things, he testified that the police detective, during his interview, had told him that his DNA could have entered D.M.'s

vagina "through contamination, that it could have happened on the toilet or in the sofa." Id. at 1616. Appellant did not respond with disbelief or outrage when the detective asked him how his DNA could have gotten into D.M.'s vagina. Instead, he said, "It was possible from her wearing [his wife's] dirty underwear." Id. at 1544. Appellant also testified that, during the interview, he had told the detective that he had previously seen D.M. "put on [his] wife's panties." Id. at 1616. D.M. "was careless," appellant explained, "because she wears [his] wife's underwear." Id. at 1642. He clarified that he meant his "wife's dirty underwear." Id. at 1643. Appellant said that he did not remember whether he had told police investigators that D.M. "didn't understand what sex was." Id. at 1636.

When asked at trial if he had "any idea at that time how [his] daughter had become pregnant," appellant said she "always spoke about the friends she had . . . ." Id. at 1617. After appellant's counsel cut his answer off midsentence with "No, no," appellant testified that, "without telling [the jury] anything that [his] daughter" had told him, he did not know how his daughter got pregnant. Id. On the ultimate question in the case, appellant testified that he never had sex with his daughter.

### B. THE MOTION TO DISMISS FOR LACK OF JURISDICTION & IMPROPER VENUE

After the close of all the evidence, appellant's counsel moved to dismiss the case for lack of jurisdiction and improper venue. The alleged rape, counsel argued, could have occurred in Maryland or Alexandria, Virginia, just as easily as in Prince William County. Because the evidence does not dispositively prove where it occurred, counsel concluded that the trial court — in its capacity as Circuit Court for Prince William County — had no choice but to dismiss the case.

Questioning this reasoning, the trial court asked appellant's counsel if that meant the crime "can't be prosecuted anywhere because nobody can figure out where it happened?" Id. at 1665. "Exactly," counsel replied. Id. The trial court responded:

> I heard no evidence that would lead me to believe there was a reasonable opportunity for [appellant] to have committed these offenses in those particular locations, because I heard no evidence upon which I could conclude he was alone with her for some appreciable period of time wherein this might have occurred.

Id. at 1666. Continuing his argument, appellant's counsel twice conceded: "There's no evidence about anything in Maryland." Id. at 1667; see also id. at 1676. This evidentiary omission, counsel argued, precluded the court from going forward with the case.

Both appellant and the prosecutor argued that the trial court, not the jury, should decide the jurisdiction and venue issues. The trial court heard differing views, however, on the burden of proof. The court did not "need to reach and decide that issue" because, "based on the evidence" before it, the court found "beyond a reasonable doubt" that the rape, if it happened at all, occurred in Prince William County, Virginia. Id. at 1693-95.

This conclusion, the trial court reasoned, followed by process of elimination. The court noted that incestuous rape is "not an offense of casual impulse" and "generally happens over time in situations where time and opportunity and temptation coincide." Id. at 1694. The evidence presented only three options. The rape either occurred during one of the four trips to visit relatives in Maryland, during the time D.M. was with babysitters in Alexandria, or during one of the many evenings appellant was with D.M. in the privacy of their home in Prince William County. Time, opportunity, and temptation — the trial court found — inexorably pointed to the home as the situs of the crime.

## C. The Motion to Dismiss for Brady Violation

During the trial, appellant's counsel moved to dismiss the case with prejudice, claiming the Commonwealth violated the constitutional disclosure rule adopted by Brady v. Maryland, 373 U.S. 83 (1963). Rather than asking for a continuance or a mistrial, counsel requested only a dismissal with prejudice.[1] The basis for the motion involved a confusing narrative.[2]

Appellant was initially charged in the juvenile and domestic relations district court ("JDR court") with rape, incest, and indecent liberties. During the JDR court proceedings, the prosecutor filed a disclosure notice pursuant to Code § 19.2-270.5 that included four DNA certificates of analysis. The certificates showed the DNA analysis of various potential suspects, including appellant, and had different dates of issue: November 15, 2010; February 17, 2011; February 23, 2011; and January 21, 2012. The JDR court certified the incest and indecent liberties charges to the grand jury, and all of the DNA certificates — except the certificate dated November 15, 2010 — were entered into evidence at that hearing. The prosecutor *nolle prosequied* the rape charge prior to the preliminary hearing.

Later, the grand jury issued a direct indictment charging appellant with rape. Prior to trial, the prosecutor filed disclosure notices pursuant to Code § 19.2-270.5. The notices included the three DNA certificates previously admitted as exhibits in the JDR court hearing as well as additional certificates correcting earlier clerical mistakes and analyzing other potential suspects. Also included was a certificate reporting the results of a private laboratory's retesting of various DNA samples. However, the November 15, 2010 certificate — which had been disclosed (but

---

[1] See App. at 952 (appellant's counsel requesting dismissal); id. at 954, 960-61, 963, 967, 972, 985, 1005-06, 1008, 1011 (trial court confirming that appellant's counsel was requesting dismissal).

[2] With consent of both parties, the trial court decided the Brady motion to dismiss based entirely on the proffers of appellant's counsel and the prosecutor. Id. at 977.

- 6 -

not used) prior to the JDR court hearing — was not disclosed at any time during the course of the circuit court proceeding initiated by the direct indictment of rape.

During the circuit court jury trial on the rape indictment (now on appeal to us), a detective testified that the November 15, 2010 certificate provided in the JDR court case was actually a "fake lab sheet" that she had prepared. App. at 884. When the detective gave the three genuine certificates to the prosecutor before the JDR court proceedings, she mistakenly included the fake certificate. The prosecutor, in turn, unintentionally provided it to appellant's counsel. Including the fake certificate with the package of genuine certificates was an "accident," the detective testified, one that neither she nor the prosecutor was aware of at the time. Id. at 1525, 1531. The detective explained that she prepared the fake certificate to use as an "interview technique" during the pre-arrest interview of appellant, but she decided not to use it. Id. at 887. Appellant's counsel confirmed at trial that appellant "never saw" the fake certificate. Id. at 1024.

Prior to the jury trial on the pending rape charge, appellant's counsel consulted with his DNA experts about the November 15, 2010 certificate provided in the JDR court proceeding and the other certificates with later dates provided in the circuit court proceeding. Because the November 15, 2010 certificate, unlike the others, was signed by a forensic toxicologist, appellant's experts dismissed it as a "rush job" relying on the "wrong analysis." Id. at 978.[3] It

_____

[3] In fact, the fake certificate did not even appear to be a paternity test. Rather, it purported to analyze "swabs . . . containing human skin cells from the victim's person" and "human saliva recovered from Buccal Swabs taken from [appellant]." Id. at 1985. There was no mention of fetal tissue, product of conception, or paternity on the certificate. Despite the fact that DNA experts only expect "the same DNA profile" to be present in "identical twins," id. at 1079, the fake certificate concluded that "[t]he DNA profiles from both sets of swabs . . . were identical," id. at 1985. It stated that "[t]he probability of randomly selecting an unrelated individual with a DNA profile matching that recovered from the swabs is greater than 6.5 billion (which is approximately the world human population)." Id. Even if appellant's experts truly

- 7 -

was at the jury trial, during cross-examination of the detective, that appellant's counsel claimed that he first learned the November 15, 2010 certificate was not genuine.

The trial court denied the motion to dismiss, noting that the fake certificate was filed in the *nolle prosequied* JDR court proceeding — not in the circuit court proceeding that followed the direct indictment charging appellant with rape. The trial court found that the prosecutor had no intent to mislead appellant with the earlier certificate. It was simply a mistake. At first glance, the fake certificate seemed to be more incriminating than the real ones, the court added, so the only arguable exculpatory value would be simply to question the detective about her initial intention (albeit unfulfilled) to use it and her ultimate decision not to do so — something appellant's counsel had already done during the trial.

Under these circumstances, the trial court held, dismissal of the indictment would be an inappropriate remedy for whatever <u>Brady</u> violation appellant could establish. Assuming "without deciding" whether a <u>Brady</u> violation occurred, the trial court reasoned that no evidence proved it was "intentional and flagrant" or that appellant suffered any prejudice "so severe" to warrant a "dismissal with prejudice due to a <u>Brady</u> violation." <u>Id.</u> at 1008-10. For this reason, the trial court held that "the appropriate remedy is to afford whatever reasonable additional remedy [other than an outright dismissal] may be appropriate so as to balance out whatever ill effects have occurred, if any." <u>Id.</u> at 1005-06.

The court then advised appellant's counsel, "I don't know what remedy, if any, you wish me to provide to you, and that's something as a matter of strategy and I'm not going to attempt to dictate your strategy." <u>Id.</u> at 1006. Despite this offer, appellant's counsel did not ask for a

---

misinterpreted the fake certificate, the mistaken interpretation would suggest that appellant was "more likely" to be the father of his daughter's child than the later, genuine certificates of analysis. <u>Id.</u> at 986.

continuance or seek a mistrial and, instead, rested solely on the request for a dismissal of the indictment. "We are simply not asking for a mistrial," counsel stated, "because we fear double jeopardy wouldn't apply. And so we don't want to abandon this trial." Id. at 1025-26.

After appellant's Brady motion to dismiss was denied, appellant's counsel asked for, but was denied, a "cautionary instruction" in which the court would advise the jury that the Commonwealth provided the defense with "manufactured DNA analysis" that the defense discovered to be false at trial. Id. at 1012. The prosecutor objected and stated that the instruction would lead the jurors to the "assumption that I gave that intentionally to trick them, and that is prejudicial, and that's what makes me a witness." Id. at 1023. The court rejected the proposed instruction and explained that it would be improper for the court to comment on the evidence to suggest the "inflammatory" implication of prosecutorial misconduct. Id. at 1021.

Appellant's counsel also asked for, and the court allowed, additional opportunity to recall and cross-examine the detective on the circumstances surrounding the fake certificate. When the detective retook the witness stand, appellant's counsel extensively cross-examined her about the fake certificate. The detective stated that she had prepared the certificate, but never used it with appellant. She admitted that she mistakenly provided the fake certificate to the prosecutor during discovery in the JDR court proceeding.

In closing argument, appellant's counsel relied upon the detective's testimony to argue that she was "willing to lie to get a conviction" and that her investigation was biased from the start. Id. at 1755. The theme played a dominant role in his argument: "She is willing to lie to a suspect in order to get a conviction. She is willing to lie to you about whether she suspected [appellant] before she questioned him. . . . She is willing to lie to you about her willingness to lie in order to get a conviction." Id. at 1756.

The jury found appellant guilty of raping his daughter. After the trial, appellant filed a motion to set aside the verdict, repeating the Brady arguments made during the mid-trial motion to dismiss. The trial court denied the motion for the reasons it previously stated. Accepting that an "unintentional" Brady violation had occurred, id. at 2069, the court pointed out:

> There was no motion for mistrial, this having specifically been declined, and I ruled that the remedy for a Brady violation discovered after a trial can be dismissal, but generally not the appropriate remedy when it's an unintentional one not involving withholding evidence of innocence, but rather discovered in the middle of trial before the Commonwealth has rested. I permitted additional latitude that the Commonwealth complained about to the Defense, including the leave to cross-examine witnesses, to open -- to at least to attempt to open up topics relating to the use of bogus evidence. I declined an instruction to that effect because I thought it was inappropriate, but I did allow considerably more leeway to the Defense in asking questions than I ordinarily would have under these circumstances. But I conclude that I do not believe that it materially affected the outcome of the trial.
>
>     *      *      *      *      *      *      *
>
> So I don't conclude that . . . this resulted in anything that undermined anyone's confidence in the outcome of the trial or that there's any probability that had that been disclosed to Defense, the result of the trial would have been different. It's unfortunate; it made for some confusion, but I do not find that it was prejudicial.

Id. at 2072, 2074.

Appellant also filed a "Motion For An Evidentiary Hearing," requesting that the trial court "initiate an investigation" into communications via Facebook between a juror and a person with the same last name. Id. at 2002, 2005. Appellant proffered that one of the jurors toward the end of the trial wrote a post on his Facebook page stating: "Anyone ever served Jury Duty? I'm wrapping up a criminal trial, hopefully tomorrow (Day 5)! Oh What Joy!!" Id. at 2003. A

person with the same last name as the juror thereafter wrote a reply comment stating: "Youre'

[sic] doing a great job, D. It's a hard one. I wouldn't have been as composed as you." Id.

Appellant argued that the exchange between the juror and the commenter entitled

appellant to examine both of them at an evidentiary hearing to determine if there was something

more that they talked about. As appellant's counsel put it:

> I mean, there's no reason to believe -- we don't -- we can't say [the
> commenter] somehow knew something about this case or knew the
> [appellant's] family, nothing like that, but it could be bias or
> prejudice or something along the lines of -- it could have been
> something about the race of the parties. It could have been
> anything and the problem is, I'm sitting here speculating. That's
> the whole point. I'm sitting here speculating.

Id. at 2077. The trial court denied the motion, holding that the Facebook comments were

"innocuous" and did not suggest any misconduct. Id. at 2089-90.

## II.

On appeal, appellant challenges his rape conviction on several grounds. His principal

claim focuses on the weight of the evidence, claiming that it was insufficient to prove his guilt.[4]

He also claims that the trial court did not have "jurisdiction or venue" to try the case.

Appellant's Br. at 1. In addition, he argues that the court erred by "not dismissing the

indictment" on Brady grounds and by providing an "inadequate remedy" for the alleged

violation. Id. Finally, appellant asserts that the court erred by not ordering an evidentiary

hearing to investigate the possibility of juror misconduct. We find no merit in these assertions.

### A. EVIDENTIARY SUFFICIENCY

We begin our review with appellant's challenge to the sufficiency of the evidence, which,

if successful, would moot every other issue in the case. In Virginia, the standard of appellate

---

[4] Appellant separates the insufficiency issue into two assignments of error. See
Appellant's Br. at 1 (Assignments of Error II and III). We will review them together.

review on this issue has been well settled. "An appellate court does not 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Williams v. Commonwealth, 278 Va. 190, 193, 677 S.E.2d 280, 282 (2009) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)).[5] "Rather, the relevant question is whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (internal quotation marks omitted). Thus, when a jury has rendered its verdict, "it is not for this court to say that the evidence does or does not establish his guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion." Cobb v. Commonwealth, 152 Va. 941, 953, 146 S.E. 270, 274 (1929). Suffice it to say, "[a]n appellate court is no substitute for a jury." Id.[6]

Consequently, "we are not permitted to reweigh the evidence," Nusbaum v. Berlin, 273 Va. 385, 408, 641 S.E.2d 494, 507 (2007), because appellate courts have no authority "to preside *de novo* over a second trial," Haskins v. Commonwealth, 44 Va. App. 1, 11, 602 S.E.2d 402, 407 (2004). Instead, we give "juries the wide discretion to which a living record, as distinguished from a printed record, logically entitles them." Bradley v. Commonwealth, 196 Va. 1126, 1136, 86 S.E.2d 828, 834 (1955). "The living record contains many guideposts to the truth which are

---

[5] See also Commonwealth v. McNeal, 282 Va. 16, 20, 710 S.E.2d 733, 735 (2011); Sullivan v. Commonwealth, 280 Va. 672, 676, 701 S.E.2d 61, 63 (2010); Prieto v. Commonwealth, 278 Va. 366, 399, 682 S.E.2d 910, 927 (2009); Williams v. Commonwealth, 278 Va. 190, 193, 677 S.E.2d 280, 282 (2009); Jones v. Commonwealth, 277 Va. 171, 182, 670 S.E.2d 727, 734 (2009); McMillan v. Commonwealth, 277 Va. 11, 19, 671 S.E.2d 396, 399 (2009); Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008).

[6] See also Courtney v. Commonwealth, 281 Va. 363, 368, 706 S.E.2d 344, 347 (2011) ("As we have said on many occasions, '[I]f there is evidence to support the convictions, the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" (alteration in original) (quoting Commonwealth v. Jenkins, 255 Va. 516, 520, 499 S.E.2d 263, 265 (1998))).

not in the printed record; not having seen them ourselves, we should give great weight to the conclusions of those who have seen and heard them." Id.

This deferential appellate standard "applies not only to findings of fact, but also to any reasonable and justified inferences the [jury] may have drawn from the facts proved." Sullivan v. Commonwealth, 280 Va. 672, 676, 701 S.E.2d 61, 63-64 (2010); see also Clanton v. Commonwealth, 53 Va. App. 561, 566, 673 S.E.2d 904, 907 (2009) (*en banc*). Thus, a factfinder may "draw reasonable inferences from basic facts to ultimate facts," Haskins, 44 Va. App. at 10, 602 S.E.2d at 406 (internal quotation marks omitted), unless doing so would "push into the realm of *non sequitur*," Thomas v. Commonwealth, 48 Va. App. 605, 608, 633 S.E.2d 229, 231 (2006) (internal quotation marks omitted).

Applying this standard, we find ample evidence upon which a rational jury could conclude that appellant raped his mentally disabled daughter. D.M. conceived a child sometime in August 2010. Her severely disabled condition required that she never be left alone. Her mother was with her during most of the mornings and took her to the babysitters in the afternoon. Appellant picked up D.M. from the babysitters and was alone with her and her younger sister for several hours at least three times a week during August 2010. Her mother returned home on or after 10:45 p.m.

DNA testing proved that there was a 99.9999% probability that appellant was the biological father of D.M.'s child when compared to any unrelated males. Investigators also tested the DNA of all related males who had the opportunity to spend time with D.M. in August 2010, along with several unrelated males. This testing specifically excluded two of appellant's brothers (Felix and Roque Martinez), his nephew (Denny Martinez), as well as several other men who were unrelated to appellant — including a babysitter's son (Julio Umanzor) and two men who live in the babysitters' residence (Hugo and Domingo Reyes).

Appellant complains that other related males were not tested. One was walked into the courtroom during the trial and was identified as Vincente Martinez (appellant's first cousin), who allegedly lived in the same building in Alexandria as D.M.'s babysitters. No evidence, however, suggested that he had ever met D.M., had ever entered the babysitters' residence, or had even spent time alone with D.M. in August 2010. Appellant also contends that his brother, who lives in El Salvador, and Vincente Martinez's brother, Alfredo, were not tested. But again, nothing suggested those men had ever met or even knew of D.M. Appellant's assertions thus fall far short of demonstrating the factual irrationality of the jury's decision.

In an alternative argument, appellant asserts that it is possible D.M. was impregnated with his sperm (a fact he assumes *arguendo*) by some method other than vaginal intercourse.[7] The Commonwealth's medical experts, appellant contends, recognized the theoretical possibility. One of those experts, however, merely opined that the probability was "[v]ery remote." App. at 749. Considering this testimony, coupled with their intuitive common sense, the jurors had ample reason to reject this attenuated hypothesis of innocence.

All of these sufficiency points, moreover, were impacted by appellant's decision to testify in his own defense. The burden of proof in criminal cases, of course, always rests on the Commonwealth. But when a criminal defendant waives his right to remain silent and takes the stand in his own defense, his personal "credibility becomes an issue." Hughes v. Commonwealth, 39 Va. App. 448, 462, 573 S.E.2d 324, 330 (2002) (internal quotation marks

---

[7] On appeal, appellant's counsel emphasizes the fact that D.M. testified that she did not have sex with her father. If it were not for D.M.'s mental disability, this fact might have resonated with the jury and perhaps with us as well. D.M. also testified she did not "know what a man or a boy does with a penis" and that she did not "have any parts that are private parts . . . that other people shouldn't touch." App. at 696-97. In her interview with the detective, D.M. said she did not know "where babies come from." Id. at 772. She later affirmed that she thought "babies come from trees." Id.

- 14 -

omitted). A jury can judge the defendant's testimony, assess his demeanor while testifying, and draw inferences about his veracity.

In this case, appellant's testimony damaged his credibility in a number of ways. He claimed the detective, during his interview, told him that his DNA could have entered D.M.'s vagina "through contamination, that it could have happened on the toilet or in the sofa." App. at 1616. The detective, however, testified that she asked appellant "how – since [appellant] was denying having sexual contact with [D.M.], how else would he explain his DNA inside of her," and appellant responded with the possibility of contamination through his wife's underwear. Id. at 1544. Appellant also admitted that he told the detective that D.M. would wear his "wife's dirty underwear," id. at 1642-43, as one explanation for how she could have become pregnant.

In addition, appellant's counsel asked appellant if he had "any idea at that time how [his] daughter had become pregnant." Id. at 1617. His answer: D.M. "always spoke about the friends she had . . . ." Id. In this answer, which was abruptly cut off by his counsel, appellant was attempting to draw a connection between D.M.'s pregnancy and her friends that she "always" spoke about. Id.[8] Yet the probability of an unrelated "friend" impregnating D.M. was about .0001%. When asked to exclude from his answer "anything that [his] daughter" had told him, id., appellant said that he did not know how she became pregnant. That answer necessarily excluded any thought, at least in his mind, that one of his untested male relatives likely committed the act.

---

[8] See generally Tice v. Commonwealth, 38 Va. App. 332, 342, 563 S.E.2d 412, 417 (2002) ("In Virginia, evidence that a crime was actually committed by someone other than the accused is admissible for the purpose of generating a reasonable doubt of the guilt of the accused. Evidence tending to show that someone other than the defendant committed the crime generally raises a factual question for the jury. A defendant is entitled to present his version of the facts along with that of the prosecution so the jury may decide where the truth lies." (internal quotation marks omitted)).

- 15 -

Finally, the jury was also entitled to consider what appellant *did not say* from the witness stand. As we have explained in a similar context:

> Where the accused takes the stand in his own behalf and voluntarily testifies for himself, he may not stop short in his testimony by omitting and failing to explain incriminating circumstances and events already in evidence, in which he participated and concerning which he is fully informed, without subjecting his silence to the inferences naturally to be drawn from it.

Wells v. Commonwealth, 32 Va. App. 775, 786, 531 S.E.2d 16, 21 (2000) (quoting Caminetti v. United States, 242 U.S. 470, 494 (1917)).[9]

Despite picking up D.M. from the babysitters at least three times a week, spending several hours with her each of those evenings in their home without any other adult present, and going on day trips to Maryland, appellant never once testified that *any other related male* had access to D.M. in August 2010. For that matter, appellant conspicuously said nothing about their whereabouts during this time frame; nor did he even suggest that they *ever* had contact with D.M. at any point in her life or even knew that she existed.

---

[9] In Caminetti, the Court approved a jury instruction which stated that "where a defendant elects to go upon the witness-stand and testify . . . it is a legitimate inference that, could he have truthfully denied or explained the incriminating evidence against him, he would have done so." Caminetti, 242 U.S. at 493; see also Carpenter v. United States, 264 F.2d 565, 569 (4th Cir. 1959) (noting that a defendant who voluntarily testifies is subject to "the fair inference which would naturally spring from his speaking only of those things which would exculpate him and refraining to speak upon matters within his knowledge which might incriminate him"); Squire v. Commonwealth, 222 Va. 633, 638-39, 283 S.E.2d 201, 205 (1981) (holding "that where the record clearly shows that the defendant chose not to rely on his right to remain silent, but instead made statements to police, the prosecution may show and comment upon the defendant's failure to relate to police crucial exculpatory statements recited by the defendant at trial"); John L. Costello, Virginia Criminal Law & Procedure § 43.7[4], at 688 (4th ed. 2009) ("Having broken his silence, the accused may not testify selectively . . . indeed comment may include reference to what he might have said, as well as to what he did say."); cf. Skipper v. Commonwealth, 195 Va. 870, 875, 80 S.E.2d 401, 404 (1954) ("A failure to assert a fact when it would have been natural to assert it amounts in effect to an assertion of the non-existence of the fact."). The ability to draw such inferences "naturally follows from the broader observation that whenever a witness testifies, his or her credibility becomes an issue." Armstead v. Commonwealth, 56 Va. App. 569, 581, 695 S.E.2d 561, 567 (2010) (internal quotation marks omitted).

In this, as in all sufficiency appeals, the issue on appeal is whether a rational factfinder could have no reasonable doubt as to the defendant's guilt. These facts amply support the rationality of the jury's decision. The DNA testing showing a 99.9999% probability that appellant fathered D.M.'s aborted child (when compared to unrelated males), the evidence of appellant's extensive opportunity in August 2010 to commit the crime, and the absence of any evidence of any other related males having a similar opportunity.

We acknowledge appellant's repeated assertion that reasonable doubt is a high standard. We certainly agree; it is perhaps one of the highest known to the law. Even so, this essential safeguard of liberty, as stringent as it is, does not ignore the axiom that "[e]vidence is seldom sufficient to establish any fact as demonstrated and beyond all doubt." Harris v. Commonwealth, 206 Va. 882, 887, 147 S.E.2d 88, 92 (1966) (quoting Toler v. Commonwealth, 188 Va. 774, 780, 51 S.E.2d 210, 213 (1949)). The governing standard does not require an acquittal based upon an "arbitrary or unreasonable doubt" or, for that matter, "a doubt of immaterial and non-essential circumstances." Taylor v. Commonwealth, 90 Va. 109, 119, 17 S.E. 812, 816 (1893). "'Anything is possible,' as Judge Posner has observed, 'but a merely metaphysical doubt . . . is not a reasonable doubt for purposes of the criminal law. If it were, no one could be convicted.'" Joyce v. Commonwealth, 56 Va. App. 646, 666, 696 S.E.2d 237, 247 (2010) (quoting United States v. Ytem, 255 F.3d 394, 397 (7th Cir. 2001)).

B. JURISDICTION & VENUE

Appellant claims that "the Commonwealth must prove beyond a reasonable doubt that the [trial] court has subject matter jurisdiction and territorial jurisdiction over the case." Appellant's Br. at 12-13. He argues that because the rape could have occurred during one of the day trips to Maryland to visit relatives or while D.M. was at the babysitters' home in Alexandria, Virginia,

- 17 -

the trial court had neither subject matter jurisdiction nor territorial jurisdiction to try the case. We find fault with several assumptions underlying appellant's argument.

We begin by defining the terms of the debate. "Subject-matter jurisdiction is about power, not simply the proper use of it." Cabral v. Cabral, 62 Va. App. 600, 607, 751 S.E.2d 4, 8 (2013). It is best described as the power "granted through constitution or statute to adjudicate a class of cases or controversies." Morrison v. Bestler, 239 Va. 166, 169, 387 S.E.2d 753, 755 (1990). A circuit court's "power to hear a criminal case comes . . . from the Virginia Constitution and the Acts of Assembly." Winslow v. Commonwealth, 62 Va. App. 539, 544, 749 S.E.2d 563, 566 (2013).

Under its authority granted by Article VI, Section 1 of the Virginia Constitution, the General Assembly has vested in circuit courts "original jurisdiction of all indictments for felonies and of presentments, informations and indictments for misdemeanors." Code § 17.1-513.[10] In short, a circuit court has subject-matter jurisdiction — that is, the judicial adjudicatory power — to preside over the trial of criminal cases.

Territorial jurisdiction is different. While subject-matter jurisdiction addresses a court's power to "adjudicate a class of cases or controversies," territorial jurisdiction involves the court's authority over "persons, things, or occurrences located in a defined geographic area." Morrison, 239 Va. at 169, 387 S.E.2d at 755. In other words, territorial jurisdiction deals not with the

---

[10] During oral argument on appeal, appellant's counsel agreed that "subject-matter jurisdiction is governed by 17.1-513," but contended that the statute specifically "says that the courts of Virginia have jurisdiction over all felonies committed in the Commonwealth." Oral Argument Audio at 47:22 to 47:30. "And that's what the law says," he emphasized. Id. When asked for clarification, appellant's counsel again repeated that Code § 17.1-513 expressly mentions "felonies committed in the Commonwealth." Id. at 49:00. The text of Code § 17.1-513, however, mentions only the circuit court's original jurisdiction — a species of jurisdiction describing the origination court for certain types of cases in contrast to a court's non-origination, appellate jurisdiction. There is no geographic limitation in Code § 17.1-513.

subject matter of the dispute (*e.g.*, crimes, contract disputes, torts, etc.) but with the physical location of the disputed conduct or thing.[11]  As a general rule, "there can be no territorial jurisdiction where conduct and its results both occur outside the state's territory."  4 Wayne R. LaFave et al., Criminal Procedure § 16.4(c), at 838-39 (3d ed. 2007).  No provision of the Virginia Constitution or Code directly says as much; but it is inherent in the common-law nature of the "judicial power," Va. Const. art. VI, § 1, and implicit in the multi-sovereign architecture of federalism.

Within the boundaries of a single state, another segmentation of territorial jurisdiction takes place.  In criminal cases, circuit courts should only preside over "offenses committed within their respective circuits."  Code § 19.2-239.  We often call this limitation "venue," but it is also known as a species of "territorial jurisdiction."  See Commonwealth v. Leone, 286 Va. 147, 151, 747 S.E.2d 809, 811 (2013) (treating the terms as "synonymous"); Kelso v. Commonwealth, 282 Va. 134, 139, 710 S.E.2d 470, 473 (2011) (noting that the terms are used "interchangeably").

----

[11] The terms are often confused and, admittedly, sometimes by us.  In Owusu v. Commonwealth, 11 Va. App. 671, 673-74, 401 S.E.2d 431, 432 (1991), we used the expression "subject matter jurisdiction" to denote what is more properly understood as territorial jurisdiction.  We later corrected that mistake:

> In Owusu, we described the failure of locational proof as a failure to prove "subject matter jurisdiction."  This failure of proof impaired the trial court's "subject matter jurisdiction" because it impaired the ability of the trial court to try the accusation before it.  The essence of the impairment, however, went not to the true subject matter of the case, the classification of the issues on trial, but rather to proof that the events alleged occurred within the trial court's territorial jurisdiction.  Thus, the issue in Owusu was, in the strictest sense, an issue of territorial jurisdiction, as is the issue in this case.

Thomas v. Commonwealth, 36 Va. App. 326, 333, 549 S.E.2d 648, 651 (2001).

These distinctions are important because a host of interrelated consequences depends on them. True subject-matter jurisdiction cannot be waived. A judgment by a court lacking subject matter jurisdiction is "void *ab initio*" and can be challenged "by all persons, anywhere, at any time, or in any manner." Winslow, 62 Va. App. at 544, 749 S.E.2d at 566 (internal quotation marks omitted). In contrast, territorial jurisdiction and venue can be waived and cannot be raised after the fact either on direct appeal or in a collateral attack.

In a criminal case, the elements of the crime must be proved beyond a reasonable doubt. But territorial jurisdiction is not an element of a crime. Owusu v. Commonwealth, 11 Va. App. 671, 674, 401 S.E.2d 431, 432 (1991) (explaining that proof of territorial jurisdiction is "not part of the crime, and therefore, does not go to the merits of the case").[12] Neither is venue. Morris v. Commonwealth, 51 Va. App. 459, 469, 658 S.E.2d 708, 712-13 (2008) (noting that venue is neither "a part of the crime," nor "a substantive element" (quoting Randall v. Commonwealth, 183 Va. 182, 187, 31 S.E.2d 571, 573 (1944); United States v. Griley, 814 F.2d 967, 973 (4th Cir. 1987))). Even when characterized as subject matter jurisdiction, the geographic *location* of an alleged offense "is not part of the crime, and therefore, does not go to the merits of the case." Thomas v. Commonwealth, 36 Va. App. 326, 333, 549 S.E.2d 648, 651 (2001) (quoting Owusu, 11 Va. App. at 674, 401 S.E.2d at 432). These concepts serve only as preconditions to the proper exercise of the court's authority, not to the guilt or innocence of the accused.[13]

---

[12] See *supra* note 11 (noting that Owusu must be understood with the clarification provided by Thomas).

[13] For this reason, a trial court dismissal (or, on appeal, a reversal) based upon the absence of territorial jurisdiction or venue does not prejudice the Commonwealth's ability to retry a criminal defendant in the appropriate forum. See Gheorghiu v. Commonwealth, 280 Va. 678, 690, 701 S.E.2d 407, 414 (2010) (remanding "for further proceedings should the Commonwealth be so inclined" because "the Commonwealth did not establish a strong presumption" of proper venue); Pollard v. Commonwealth, 220 Va. 723, 726, 261 S.E.2d 328, 330 (1980) (remanding "for further proceedings" rather than dismissing because the failure to

Virginia courts have not specifically addressed the burden of proof applicable to territorial jurisdiction. But the law governing venue is well settled. "Since venue does not represent an element of the offense, the Commonwealth need not prove it beyond a reasonable doubt." Taylor v. Commonwealth, 58 Va. App. 185, 190, 708 S.E.2d 241, 243 (2011) (citations omitted). It is enough for the evidence to permit a "strong presumption" that the crime occurred within the proper venue. Bonner v. Commonwealth, 62 Va. App. 206, 210-11, 745 S.E.2d 162, 165 (2013) (*en banc*) (internal quotation marks omitted).[14] A strong presumption asks far less of the evidence than does the reasonable doubt standard. Under the strong-presumption standard, "venue has been sufficiently proven when its location is the only reasonable inference that can be

---

prove venue "did not stem from evidentiary sufficiency with respect to the guilt or innocence of the defendant"); Bonner v. Commonwealth, 62 Va. App. 206, 210-11, 745 S.E.2d 162, 165 (2013) (*en banc*) (reversing for failure to prove venue and remanding "to the trial court for further proceedings, including trial in a proper venue if the Commonwealth be so advised"); Taylor v. Commonwealth, 58 Va. App. 185, 193, 708 S.E.2d 241, 245 (2011) (holding that "[w]here venue was improper, this Court should remand the case for a new trial in an appropriate venue"); Thomas v. Commonwealth, 38 Va. App. 319, 325-26, 563 S.E.2d 406, 409 (2002) (reversing and remanding "for transfer" because "venue was improper"); Green v. Commonwealth, 32 Va. App. 438, 450, 528 S.E.2d 187, 193 (2000) (remanding for "retrial in a proper venue" when the "Commonwealth did not meet its burden to establish venue" because "venue is not part of the crime" (internal quotation marks omitted)); Sutherland v. Commonwealth, 6 Va. App. 378, 383, 368 S.E.2d 295, 298 (1988) (reversing and remanding "for further proceedings, if the Commonwealth be so advised," because although "the Commonwealth did not meet its burden of proving venue," that "error did not stem from evidentiary insufficiency with respect to the guilt or innocence of the defendant" (internal quotation marks omitted)).

[14] See also Gheorghiu, 280 Va. at 690, 701 S.E.2d at 414; Cheng v. Commonwealth, 240 Va. 26, 36, 393 S.E.2d 599, 604 (1990); Pollard, 220 Va. at 726, 261 S.E.2d at 330; Keesee v. Commonwealth, 216 Va. 174, 175, 217 S.E.2d 808, 810 (1975); Harding v. Commonwealth, 132 Va. 543, 548, 110 S.E. 376, 378 (1922); Chambliss v. Commonwealth, 62 Va. App. 459, 467, 749 S.E.2d 212, 216 (2013); Spiker v. Commonwealth, 58 Va. App. 466, 469, 711 S.E.2d 228, 229 (2010); Taylor, 58 Va. App. at 190, 708 S.E.2d at 243; Kelso v. Commonwealth, 57 Va. App. 30, 36, 698 S.E.2d 263, 266 (2010), aff'd, 282 Va. 134, 710 S.E.2d 470 (2011); Raja v. Commonwealth, 40 Va. App. 710, 725-26, 581 S.E.2d 237, 244 (2003); Thomas, 38 Va. App. at 323, 563 S.E.2d at 408; Foster-Zahid v. Commonwealth, 23 Va. App. 430, 442, 477 S.E.2d 759, 765 (1996); Davis v. Commonwealth, 14 Va. App. 709, 711, 419 S.E.2d 285, 287 (1992); Sutherland, 6 Va. App. at 381, 368 S.E.2d at 297.

drawn from the evidence." Randall, 183 Va. at 188, 31 S.E.2d at 573 (citing Hart v. Commonwealth, 131 Va. 726, 109 S.E. 582 (1921)).[15]

Because Virginia treats territorial jurisdiction as "synonymous" with venue, Leone, 286 Va. at 151, 747 S.E.2d at 811, so much so that the terms are "used interchangeably," Kelso, 282 Va. at 139, 710 S.E.2d at 473, it would be sensible that both should be governed by the same strong-presumption standard.[16] Different burdens of proof for interchangeable synonyms would require an explanation we find hard to conjure — particularly when one considers the general principle that "[e]vidence which establishes venue will also support territorial jurisdiction because a crime committed within a particular judicial district will necessarily have been committed within the state." 4 LaFave, *supra*, § 16.4(d), at 860 n.127.

We acknowledge that these concepts involve highly abstract doctrines, particularly as they intersect burden-of-proof issues, which are not always applied with analytical precision. In this case, however, we need not tease a uniform rule out of the sometimes conflicting precedents. Sitting as factfinder, the trial court used the highest burden of proof — beyond a reasonable doubt — and found that the evidence pointed only to one reasonable inference as to the situs of the crime: It occurred in the private confines of the family home in Prince William County, where appellant spent several hours alone with his daughters on at least three evenings each week during August 2010. App. at 1693-95. The evidentiary record supports this finding.

---

[15] On venue questions, federal courts use a "preponderance of the evidence" burden of proof. See United States v. Engle, 676 F.3d 405, 412 (4th Cir. 2012); United States v. Villarini, 238 F.3d 530, 534 (4th Cir. 2001); United States v. Barsanti, 943 F.2d 428, 434 (4th Cir. 1991); United States v. Griley, 814 F.2d 967, 973 (4th Cir. 1987).

[16] We acknowledge appellant's citation to Fitch v. Commonwealth, 92 Va. 824, 24 S.E. 272 (1896), but do not read it to apply the reasonable-doubt standard to questions of territorial jurisdiction. The case involved an *intrastate* venue dispute, properly called in the opinion a question of "territorial jurisdiction." Id. at 828, 24 S.E. at 273. The governing burden of proof for intrastate venue has long been the "strong presumption" standard. See *supra* note 14.

As appellant's counsel conceded in the trial court, "There's no evidence about anything in Maryland." Id. at 1667; see also id. at 1676. The same can be said of the time D.M. spent with her female babysitters in Alexandria. "I heard no evidence," the trial court stated, "that would lead me to believe there was a reasonable opportunity for him to have committed these offenses in those particular locations, because I heard no evidence upon which I could conclude he was alone with her for some appreciable period of time wherein this might have occurred." Id. at 1666.

Determining the "place where the crime was committed" is "a matter of fact" to be decided by the factfinder.[17] Early v. Commonwealth, 93 Va. 765, 767, 24 S.E. 936, 937 (1896). In this case, the parties agreed to submit the issue to the court for resolution. As we have often said, a trial judge's "major role is the determination of fact, and with experience in fulfilling that role comes expertise." Haskins, 44 Va. App. at 11, 602 S.E.2d at 407 (internal quotation marks omitted). We examine trial court fact-finding "with the highest degree of appellate deference." Thomas, 48 Va. App. at 608, 633 S.E.2d at 231. Giving that deference here, we hold that the trial court reasonably concluded that the crime occurred in appellant's home in August 2010.

The reasonableness of this conclusion is bolstered by the alternative offered by appellant. The trial court correctly understood that, under appellant's reasoning, *even if* he admitted that he raped his daughter, he could not be "prosecuted anywhere because nobody can figure out where it happened." App. at 1665. Like the trial court, this conclusion strikes us as an anomaly to be judiciously avoided.

---

[17] For this reason, many courts submit the issue (where the underlying dispute involves more than a scintilla of evidence) to the jury. See United States v. Ebersole, 411 F.3d 517, 526 n.10 (4th Cir. 2005) ("Submitting the venue question to the jury is an appropriate procedure for resolving a factual dispute relating to venue."); accord Richardson v. Commonwealth, 80 Va. 124, 124-25 (1885).

Appellant's counsel contends that he first learned at trial that one of the several DNA certificates of analysis was a fake prepared by a detective for possible use during a pre-arrest interview of appellant.[18] Appellant argues that the trial court erred in "not dismissing the indictment" with prejudice to remedy this alleged Brady violation and by providing lesser, inadequate remedies. Appellant's Br. at 36.

We begin our analysis by framing the issue with several key circumstances that are not in dispute. Appellant concedes that the fake DNA certificate was:

---

[18] It is not at all unusual — or, for that matter, judicially censorable — for law enforcement investigators to use trickery and subterfuge when interviewing a criminal suspect. See, e.g., Illinois v. Perkins, 496 U.S. 292, 297 (1990) ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within Miranda's concerns."); Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (*per curiam*) (noting that an "officer's false statement about having discovered [the defendant's] fingerprints at the scene," while perhaps relevant to other issues, did not create a "coercive environment"); Frazier v. Cupp, 394 U.S. 731, 739 (1969) (holding that misrepresentations made by police during a suspect's interrogation are insufficient "to make [an] otherwise voluntary confession inadmissible"); Rodgers v. Commonwealth, 227 Va. 605, 616, 318 S.E.2d 298, 304 (1984) ("Even a lie on the part of an interrogating police officer does not, in and of itself, require a finding that a resulting confession was involuntary."); Smith v. Commonwealth, 219 Va. 455, 470, 248 S.E.2d 135, 144 (1978) (concluding that a waiver of Miranda rights was voluntary even when officers had falsely stated "that defendant's fingerprints and footprints had been found at the scene of the crime"); Arthur v. Commonwealth, 24 Va. App. 102, 107, 480 S.E.2d 749, 752 (1997) (noting that Virginia courts "consistently have held that a lie by a law enforcement officer does not, in and of itself, require a finding that a resulting confession was involuntary" (internal quotation marks omitted)); Novak v. Commonwealth, 20 Va. App. 373, 387-88, 457 S.E.2d 402, 409 (1995) (stating that "[d]efendant's contention that [an officer's] use of deception tainted the confession is also without merit"); Wilson v. Commonwealth, 13 Va. App. 549, 554, 413 S.E.2d 655, 658 (1992) (noting that while the defendant "may have been tricked or influenced by the tactics of the officer, the interrogation was not so compelling or coercive that he was not able to consider his options and exercise his will"); Terrell v. Commonwealth, 12 Va. App. 285, 292, 403 S.E.2d 387, 390 (1991) (holding a confession voluntary even though "police officers made misrepresentations to the appellant indicating that hair fibers could be matched with the same degree of accuracy as fingerprints and that one of the victims had AIDS"); Foster v. Commonwealth, 8 Va. App. 167, 174-75, 380 S.E.2d 12, 16 (1989) (describing an officer's "false representation" that the defendant's "fingerprints were on the gun" as "perhaps ethically improper," but not impermissible).

- more incriminating than any of the other genuine certificates of analysis, see App. at 986;

- never used during any interview or interrogation of appellant, see Appellant's Br. at 8;

- mistakenly included with three genuine certificates of analysis in a pretrial disclosure during the JDR court proceeding over charges that were later dismissed, see App. at 955, 1002, 1023;

- never introduced into evidence at the preliminary hearing in the JDR court, see id. at 984; and

- never produced by the Commonwealth (either prior to or at trial) during the circuit court proceeding on the rape charge initiated by direct indictment, id. at 983-85.

It is also important that appellant never asked the trial court for a continuance or for a mistrial, but instead insisted that the only fair remedy was to dismiss the indictment with prejudice. According to appellant, "[a] dismissal was the only adequate remedy" to the alleged Brady violation. Appellant's Br. at 42.

In this case, we question whether a true Brady violation even occurred. Under settled principles, there are "three components of a true Brady violation," Strickler v. Greene, 527 U.S. 263, 281-82 (1999), and "[t]he accused has the burden of establishing *each of these three components to prevail on a Brady claim*," Commonwealth v. Tuma, 285 Va. 629, 635, 740 S.E.2d 14, 17 (2013) (emphasis added) (citing Skinner v. Switzer, 131 S. Ct. 1289, 1300 (2011)). The first two components require the evidence to be favorable to the defendant and to have been suppressed by the prosecution. The third component, as necessary as the first two, is that the defendant must prove prejudice. See Tuma, 285 Va. at 636, 740 S.E.2d at 18 (noting that, under Brady, "a defendant must show that the failure to earlier disclose prejudiced him because it came so late that the information disclosed could not be effectively used at trial" (internal quotation marks omitted)).

The trial court found that appellant did not suffer any prejudice.[19] As the court noted, appellant's counsel was given considerable latitude to cross-examine the detective about the fake certificate. The record shows that he vigorously took advantage of the opportunity to do so. At oral argument on appeal, when asked what additional cross-examination he would have pursued had he known of the fake certificate earlier, appellant's counsel stated that he "didn't know" what he might have asked without conducting additional discovery.[20] Oral Argument Audio at 34:20 to 34:30. These circumstances fully confirm the trial court's finding that appellant suffered no real prejudice as a result of the mid-trial disclosure and, thus, did not establish a viable Brady violation.[21]

We must also address another aspect of appellant's Brady argument, lest our silence on the subject imply our tacit agreement. As he did in the trial court, appellant assumes the proper remedy for a Brady violation is a dismissal with prejudice of the criminal charge. See Appellant's Br. at 46 ("Wherefore, the defendant requests that this Court dismiss Martinez's

---

[19] See App. at 2072-74 ("It's unfortunate; it made for some confusion, but I do not find that it was prejudicial.").

[20] On appeal, appellant's counsel also refers to a remark he made during his opening statement mentioning the November 2010 DNA test, see App. at 492, and asserts that the remark "possibly" harmed appellant's credibility, Appellant's Br. at 39-40. However, the remark was made in passing and in the context of alleging the state-run laboratory's potential bias and uncertainty of the results. See App. at 492. The discovery that the November 15, 2010 certificate was fake arguably supported, rather than undermined, appellant's allegations of bias — which appellant's counsel emphatically asserted during his closing statement. See App. at 1755-56.

[21] As appellant correctly points out, the trial court several times mentioned "a Brady violation," App. at 975, 1567, 1999, 2069-70, but the context of those remarks indicates that the court was referring only to the first and second components of a true Brady violation. At other times, the court stated it was assuming "without deciding" a Brady violation occurred. Id. at 1008-09. We see no need to dissect the trial court's remarks. The court clearly and consistently held that appellant suffered no prejudice, an essential component of a true Brady violation. The court seemed concerned only about the first two components: whether the evidence was favorable and whether it was suppressed by the prosecution.

conviction to remedy the Commonwealth's egregious <u>Brady</u> violation in this case."). No Virginia appellate court has ever dismissed an indictment even when a <u>Brady</u> violation had been clearly shown. <u>Brady</u> involves the constitutional disclosure obligations of the prosecution — not the guilt or innocence of the defendant. For that reason, the proper remedy for a proven violation includes a continuance, a mistrial, or some lesser remedy.[22]

It is true that courts have the ultimate power to dismiss a criminal charge for prosecutorial misconduct, which courts have rightly described as a "drastic remedy" to be imposed "only in very limited and extreme circumstances." <u>United States v. Broward</u>, 594 F.2d 345, 351 (2d Cir. 1979). As a result, the dismissal remedy is available only upon a showing of *irreparable* prejudice — the kind that a "retrial" (following a trial court mistrial order or an appellate reversal and remand) could not "fully cure." <u>United States v. Dyess</u>, 478 F.3d 224, 236 (4th Cir. 2007) (noting that "dismissal of the indictment does not necessarily follow as a remedy" when "[r]etrial, for example, may fully cure prejudice" (citing <u>United States v. Derrick</u>, 163 F.3d 799 (4th Cir. 1998))).

Moreover, because "the law frowns on the exoneration of a defendant for reasons unrelated to his guilt or innocence," the dismissal remedy permitted under the "outrageous government misconduct doctrine is reserved for the most appalling and egregious situations." <u>United States v. Guzman</u>, 282 F.3d 56, 59 (1st Cir. 2002). "At the very least, the defendant must show that the challenged conduct violates commonly accepted norms of fundamental fairness and is shocking to the universal sense of justice." <u>Id.</u>

---

[22] <u>See, e.g.</u>, <u>Bly v. Commonwealth</u>, 280 Va. 656, 664, 702 S.E.2d 120, 124 (2010) (reversing and remanding "for a new trial"); <u>Workman v. Commonwealth</u>, 272 Va. 633, 651, 636 S.E.2d 368, 378 (2006) (ordering "a new trial because of <u>Brady</u> violations"); <u>Bowman v. Commonwealth</u>, 248 Va. 130, 136, 445 S.E.2d 110, 114 (1994) ("granting . . . a new trial" to remedy a <u>Brady</u> violation).

None of these concerns exist in this case. The trial court found, and we affirm, that appellant suffered no genuine prejudice — much less irreparable prejudice that only a dismissal could remedy. The court likewise found no evidence suggesting that the initial disclosure of the fake DNA certificate was "an intentional act on the part of the Commonwealth's Attorney's Office," App. at 1714, much less an appalling and egregious act. To be sure, it appears to have been a purely innocent mistake. See, e.g., United States v. Hemmer, 729 F.2d 10, 13-14 (1st Cir. 1984) (affirming denial of motion to dismiss on grounds of prosecutorial misconduct because the government's failure to timely comply with a discovery order was mere "negligence" rather than "bad faith or other willful misconduct").[23] For these reasons, the trial court properly rejected appellant's request for a dismissal of the rape charge.

### D. THE MOTION FOR AN EVIDENTIARY HEARING ON POTENTIAL JURY MISCONDUCT

Finally, appellant contends that the Facebook communications between one juror and a person with the same last name as the juror required the trial court to "initiate an investigation" into the possibility of juror misconduct. App. at 2002, 2005. The Facebook message by the juror stated: "Anyone ever served Jury Duty? I'm wrapping up a criminal trial, hopefully tomorrow (Day 5)! Oh What Joy!!" Id. at 2003. Someone with the same last name replied: "Youre' [sic] doing a great job, D. It's a hard one. I wouldn't have been as composed as you." Id.

---

[23] See also United States v. Struckman, 611 F.3d 560, 577 (9th Cir. 2010) (noting that "dismissal with prejudice may be an appropriate remedy for a Brady . . . violation . . . where prejudice to the defendant results and the prosecutorial misconduct is flagrant"); United States v. Houghton, 554 F.2d 1219, 1224-25 (1st Cir. 1977) (refusing to dismiss an indictment because there was no evidence that a delay in producing Brady material was deliberate or that defendant was prejudiced).

Appellant's counsel conceded in the trial court that "there's no reason to believe" that the commenter "somehow knew something about this case . . . nothing like that, but it could be bias or prejudice or something along the lines of -- it could have been something about the race of the parties." Id. at 2077. Appellant's counsel, however, proffered no factual basis for suspecting racial bias or prejudice. Indeed, appellant's counsel candidly admitted: "It could have been anything and the problem is, I'm sitting here speculating. That's the whole point. I'm sitting here speculating." Id.

The trial court acted well within its discretion in denying appellant's motion for an evidentiary hearing. When considering a charge of juror misconduct, "the trial court has the affirmative duty to investigate the charges and to ascertain whether or not, as a matter of fact, the jury was guilty of such misconduct." Evans v. Commonwealth, 39 Va. App. 229, 237, 572 S.E.2d 481, 484 (2002) (internal quotation marks omitted). This duty, however, presupposes a *prima facie* credible charge of misconduct. See Nelson v. Commonwealth, 41 Va. App. 716, 732-33, 589 S.E.2d 23, 31 (2003) (holding that the defendant must present "*credible allegations of bias* that undermine the prior determination of impartiality"); Hall v. Commonwealth, 14 Va. App. 65, 74, 415 S.E.2d 439, 444-45 (1992) (requiring "a showing that extraneous information has been injected into jury deliberations" or other "misconduct").[24]

---

[24] See also United States v. Lawrence, 735 F.3d 385, 441-42 (6th Cir. 2013) ("To obtain a hearing to investigate evidence of juror misconduct, a defendant must do more than simply raise the possibility of bias. He must raise a colorable claim of extraneous influence." (internal quotation marks and citations omitted)); United States v. Morales, 655 F.3d 608, 630 (7th Cir. 2011) (affirming denial of a hearing to investigate juror misconduct when "any potential bias is a matter of sheer speculation"); United States v. Vitale, 459 F.3d 190, 197 (2d Cir. 2006) (stating a hearing is required "when there is clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." (internal quotation marks and citation omitted)); United States v. Hanley, 190 F.3d 1017, 1031 (9th Cir. 1999) (holding that a district court did not err by refusing to hold an evidentiary hearing when "[i]t considered the content and the seriousness of the alleged statements and properly determined that such vague statements did not expose Defendants to

Here, appellant's counsel asserted the speculative possibility of racial bias or prejudice without a scintilla of proof.  Nothing in the Facebook messages hinted at the issue of race.  As a matter of law, such a concededly speculative allegation of misconduct does not trigger the trial court's duty to hold an evidentiary hearing.  "Speculation and unsubstantiated allegations do not present a colorable claim of outside influence of a juror."  United States v. Wintermute, 443 F.3d 993, 1003 (8th Cir. 2006).

III.

In sum, we find no merit in appellant's sufficiency challenge, objection to jurisdiction and venue, Brady arguments, or request for an evidentiary hearing on possible juror misconduct.  We thus affirm his rape conviction.

Affirmed.

---

unfair prejudice"); United States v. Cheek, 94 F.3d 136, 141 (4th Cir. 1996) ("The party who is attacking the verdict bears the initial burden of introducing competent evidence that the extrajudicial communications or contacts were more than innocuous interventions." (internal quotation marks omitted)); United States v. Moses, 15 F.3d 774, 778 (8th Cir. 1994) ("Not every allegation of outside influence requires an evidentiary hearing."); United States v. Caldwell, 776 F.2d 989, 998 (11th Cir. 1985) ("The more speculative or unsubstantiated the allegation of misconduct, the less the burden to investigate."); United States v. Barshov, 733 F.2d 842, 851 (11th Cir. 1984) ("The duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality.  In other words, there must be something more than mere speculation." (citations omitted)).